Pollock's Estate.

302

Argued December 2, 1931.   Before Frazer, C. J.,
Walling, Kephart, Schaffer, Maxey and Drew, JJ.

*Robert T. McCracken,* with him *John F. Headley* and *Henry P. Erdman,* for appellant, Roland D. Pollock.— Appellant was not a trustee for his mother: Devine's Est., 199 Pa. 250; Lafferty's Est., 230 Pa. 496; Gould's Est., 270 Pa. 535.

Appellant was given the beneficial interest in the stock bequeathed him.

The will created an equitable charge: McFait's App., 8 Pa. 290; Hanna's App., 31 Pa. 53; Pierce v. Livingston, 80 Pa. 99; Hammond's Est., 197 Pa. 119; Moran's Est., 13 Pa. Superior Ct. 251; Gumaer's Est., 19 Pa. Superior Ct. 621; Fleming v. Fleming, 204 Pa. 648.

The requirement of security resulted in a debtor-creditor relationship: Reiff's App., 124 Pa. 145; Letterle's Est., 248 Pa. 95; Weir's Est., 251 Pa. 499; Kirkpatrick's Est., 284 Pa. 583; Strawbridge's Est., 14 Pa. D. & C. 703; Fidelity, etc., Deposit Co. v. Dietz, 132 Pa. 36.

There was no confidential relation between appellant and his mother which placed the burden of proof on appellant: Null's Est., 302 Pa. 64; Crothers v. Crothers, 149 Pa. 201; Sawyer v. White, 122 Fed. 223; Keen's Est., 299 Pa. 430; Koons's Est., 293 Pa. 465.

Even assuming the burden of proving uberrima fides was on appellant, it was effectively carried: Thorndell v. Munn, 298 Pa. 1; Null's Est., 302 Pa. 64; Carney v. Carney, 196 Pa. 34.

The statute of limitations has run against the claim of contestants: Etter v. Greenawalt, 98 Pa. 422; Hostetter v. Hollinger, 117 Pa. 606; Dorrance v. Ryon, 35 Pa. Superior Ct. 180; Ashhurst's App., 60 Pa. 290.

If appellants are entitled to anything they are entitled to a return of the stock: Musselman v. Eshleman, 10 Pa. 394; Willits's Est., 18 Phila. 167; Church v. Winton, 196 Pa. 107; Beeson v. Beeson, 9 Pa. 279; Smedley v. Varley, 23 Beav. 358.

There has been no demand by appellants for the return of the stock dividend, and no unqualified refusal by appellee: Taylor v. Hanlon, 103 Pa. 504; Allison v. Mont-

gomery, 107 Pa. 455; Spear v. Alexander, 2 Phila. 89; Prentiss v. Hannay, 4 Whart. 508; Wright v. Leather Co., 257 Pa. 552.

*Ira Jewell Williams,* of *Brown & Williams,* for appellants, Girard Trust Co. et al., executors of will of Margaret Pollock, deceased.—Accountant was a trustee: Mooney's Est., 205 Pa. 418; Smith's Est., 144 Pa. 428.

Accountant, having tried the case below on the theory of his admitted trusteeship, and having filed his sworn account as trustee, may not now disclaim the trust relation: Rankin v. Rodgers, 302 Pa. 17; Sakman v. McCormick, 278 Pa. 268; Morrett v. Fire Assn., 265 Pa. 9; Knecht v. Knecht, 261 Pa. 410; Achenbach v. Stoddard, 253 Pa. 338; Armstrong & Latta v. Phila., 249 Pa. 39.

The waiver of security did not affect the measure of accountant's duty.

The will did not create an equitable charge: McFait's App., 8 Pa. 290; Etter v. Greenawalt, 98 Pa. 422.

The burden was on the trustee to show that he had acted with the highest good faith: Thorndell v. Munn, 298 Pa. 1; Null's Est., 302 Pa. 64; Miller's App., 30 Pa. 478; Donner v. Donner, 211 Pa. 409; Hollenback's App., 121 Pa. 322, 342; Simon v. Simon, 163 Pa. 292, 301; Matthaei v. Pownall, 235 Pa. 460, 465, 467-8; Chiswell v. Campbell, 300 Pa. 68; Tanner's Est., 218 Pa. 361; Greenfield's Est., 14 Pa. 489; Wistar's App., 54 Pa. 63.

The relationship was fiduciary and confidential in the highest degree.

The burden of proving good faith was not borne; bad faith was clearly shown: Lawrence v. King, 299 Pa. 568; Nirdlinger's Est., 290 Pa. 457; Swift & Co. v. U. S., 111 U. S. 22; Eisner v. Macomber, 252 U. S. 189.

A defrauded cestui que trust is entitled to the value of the thing taken, at the time of taking; and is not restricted to the return of the res, especially if that remedy is illusory: Whitaker v. Houghton, 86 Pa. 48; Harger v. McMains, 4 Watts 418; Freas's Est., 231 Pa.

256; Chiswell v. Campbell, 300 Pa. 68; McKeown's Est., 263 Pa. 78; Reading Iron Works Est., 149 Pa. 182; Gervis v. Kay, 294 Pa. 518.

The contestants are entitled to the actual value as measured by the assets: Montgomery Bank v. Reese, 26 Pa. 143; Gervis v. Kay, 294 Pa. 518; Kountz v. Kirkpatrick, 72 Pa. 376; Lehigh & Wilkes-Barre Coal Co.'s Assessment, 298 Pa. 294, 300.

The law of Pennsylvania as to the valuation of stock, where no market value is established, is well known: Harris's App., 9 Sadler 233; Blood v. S. & L. Co., 164 Pa. 95; Duroth Mfg. Co. v. Cauffiel, 243 Pa. 24; McWilliams v. Altemus, 288 Pa. 277; Jarvis v. Bell, 296 Pa. 568.

It next becomes important to determine as of what date the award should be given. Contestants submit that they are at least entitled to be paid damages as of the time the wrong was committed: Bank of Montgomery v. Reese, 26 Pa. 143; Wilson v. Whitaker, 49 Pa. 114.

Interest should be allowed: Brooks-Scanlon Corp. v. U. S., 265 U. S. 106; Whitcomb v. Phila., 264 Pa. 277; Allegheny v. Campbell, 107 Pa. 530.

OPINION BY MR. JUSTICE DREW, February 3, 1932:

In this case each side appealed. The decision of a single question in the negative will settle both appeals, but an answer in the affirmative will require passing upon another question, to wit, the proper measure of damage. The question is: Did the will of James Pollock create a trust in his son of certain stock for his widow? The lower court, by a vote of three to two, answered this question in the affirmative, and surcharged the alleged trustee with certain stock in specie.

James Pollock was a well-known citizen of Philadelphia. For fifty years prior to his death on September 26, 1917, he was engaged in the manufacture of carpet rugs. During the latter part of his life he did business as the Pollock-Huston Company, a Pennsylvania corpo-

ration with a capital stock of $300,000, divided into 3,000 shares of $100 par value. Of these he owned 2,480 shares, and his son and officers of his company held the remainder. His son had been associated with him in the business for twelve years, and at the time of his father's death was its general manager. Mr. Pollock left surviving him his wife, a son, and two daughters. In his will he said: "I give and bequeath to my son, Roland Dudley Pollock, Twenty three hundred and seventy (2370) shares of the capital stock of the Pollock-Huston Company, provided, however, and under the condition that he shall make payment of one half of all dividends that may be declared thereon of any kind or nature to my said wife for and during the term of her natural life." Other bequests were made, and the residue of the estate was given to the executors, Roland Dudley Pollock and Industrial Trust Company, for certain trusts. On the audit of the account of the executors, the 2,370 shares aforesaid were awarded to Roland Pollock. He accepted them with the condition attached, and his mother consented to the stock being delivered to him without his giving security to perform the condition. There was no suggestion then, nor at any time during the life of Mrs. Pollock, that the will created a trust of this stock. She lived twelve years after her husband and died on February 28, 1929, and shortly thereafter her executors, Girard Trust Company, Charles B. Heston, Jr., and Lillian F. Ferguson, a daughter and beneficiary under her will, called upon Roland Pollock to file an account of all dividends received by him on the stock. He filed the account, and showed distribution to his mother of one-half of all cash dividends received by him, and distribution to himself of a stock dividend, one-half of which, or 1,185 shares, would have gone to his mother under the provisions of his father's will, but which he claimed under the terms of an agreement made with her on February 8, 1923, shortly before the stock dividend was declared. Objection having been made to this credit,

the auditing judge disallowed it, declared him a trustee, and surcharged him with the cash value of the stock at the time of the dividend. Exceptions were then filed to this adjudication and the court in banc, by a vote of three to two, held him to be a trustee, declared that he had failed to show this transaction to be fair and conscionable and beyond the reach of suspicion, and surcharged him with the 1,185 shares of stock in specie. Roland Pollock appealed from the decree holding him to be a trustee and surcharging him, and Mrs. Pollock's executors appealed from the refusal to surcharge him with the cash value of the stock.

The facts surrounding the declaration of the stock dividend were as follows: In September, 1922, the Pollock-Huston Company was in a highly prosperous condition. It was doing a profitable business, was free of debt, and had a cash surplus of $380,000. At that time "seamless" rugs appeared on the market, and since the Pollock-Huston Company was not equipped to manufacture them, its directors and Mrs. Pollock, who always took an active interest in the business, viewed this development in the trade with much concern, and decided that its rugs, made of narrow strips of carpet sewed together, could not withstand the competition. It was thought that unless the factory was equipped with "wide looms" to make the new style rugs it would quickly become obsolete, and the business would be lost. To install the new looms would involve the purchase of expensive machinery, requiring more floor space than was available, and necessitating the purchase of adjoining land and the erection of a new building. At a meeting at the home of Roland Pollock, at which Mrs. Pollock as well as all the directors of the company were present, this situation was discussed, and it was decided to undertake a program of expansion and improvement, using for this purpose the large cash surplus at hand. Mrs. Pollock was entirely satisfied as to the wisdom of this step. In order so to utilize the surplus without running the risk

of an anticipated federal tax on undistributed surplus, it was suggested by the legal adviser of the company that it be turned into capital by the device of a stock dividend. This plan was agreed to, but Roland Pollock, realizing that if the capital stock of the company was increased from 3,000 to 7,500 shares, as proposed, he would lose control of the company, that he would no longer be the owner of all stock of the company in his family, that his mother would receive 1,185 shares under the provision of his father's will which she could dispose of as she pleased, and insisting that such was not his father's intention, refused to sanction the proposal unless his mother agreed, in advance, that all of the stock so distributed as a dividend on the stock he held under the will should go to him. He talked with her about this, and she freely agreed to it, provided she would receive one-half the cash dividends on that stock, in other words, that he would hold it on the same condition as the old stock. Before concluding the transaction she discussed the proposition with her attorney, who was also the attorney for the company and for her son, and who had represented the estate of her husband, and her rights were fully explained to her. The result of these discussions was that the attorney, at Mrs. Pollock's request, prepared an agreement covering the transaction and sent it to her, together with a letter in which he clearly explained that she would be entitled to the stock dividend if it were declared, but that "Roland could hardly afford to declare this stock dividend......unless you agreed in advance not to claim it"; and that inasmuch as he was in sympathy with "Roland's plans for the company's future" he hesitated to advise her, and suggested that she talk it over with friends. Two days later she sent for her son and the attorney, told them that she was satisfied with the arrangement, and then signed the agreement. Following this, the capital of the company was increased to $750,000 made up of 7,500 shares, and a stock dividend of 100% was declared, thus

turning $300,000 of the surplus into capital. This left $150,000 worth of stock available for a proposed sale to employees, but none of it was ever so issued. The company went ahead with the program of improvement, and spent about $450,000 for land, buildings and machinery. As a matter of fact, the "wide looms" were not installed, as it was discovered that they had not been entirely perfected, and more narrow looms were bought. The company continued to be profitable, although diminishingly so, until 1928, when a net loss was incurred. Since then, the company has lost money rapidly, and it is now in process of liquidation.

Shortly after signing this agreement Mrs. Pollock made her will, and gave the bulk of her estate to her two daughters. She made no provision for her son. She showed him the will, and explained in a kindly and motherly way that she took this action because she felt that his father had taken good care of him by giving him the business. She said in the will, "I wish to state that it is not through any lack of affection for my son Roland, or his family, that I make this disposition of the residue of my estate, but because I feel he has been amply provided for under his father's will and upon my death will receive the entire benefit of the stock of the Pollock-Huston Company given him under his father's will." This was repeated almost verbatim in the last will she made, some four years later.

Mrs. Pollock was seventy years of age at the time she signed the stock agreement. She was in excellent health, a strong, vigorous woman for her age. She suffered some from asthma, but it did not prevent her living alone in a large hotel, or taking several trips to Europe after the making of the agreement. She was a business woman, assisted her husband, took an active interest in his business, during his life and until her own death, and it is admitted that she was possessed of high intelligence and strong will. No question is raised regarding her capacity to make the stock agreement; and it is not denied

that when she did so she had complete knowledge of all the facts.

It is undoubtedly true that Roland Pollock, when called upon to account, concluded that he was a trustee, and that his counsel did the same. The account filed was entitled "First and Final Account of Roland Dudley Pollock, Special Trustee." It may well be that this admission helped the able auditing judge to the same conclusion, and that it had its effect on the learned judges who joined in the majority opinion in the court below. It was not until the oral argument before the court in banc that Roland Pollock first insisted he should not be so considered. His belated awakening in this respect, twelve years after he had been given the stock in the audit of his father's estate without any mention of a trust, is no more strange and remarkable than his reconstructing his business at a cost of $450,000 to make "seamless rugs" before the machinery to make them had been perfected. This much should be said in his favor, to avoid any possible misunderstanding of his motive, that since he owned almost the entire capital stock outstanding, he sustained personally almost the entire loss.

It is now contended that this question cannot be raised by appeal, inasmuch as it was not brought before the lower court until the oral argument, and because there is no assignment of error as to the specific point. We are of opinion this contention is clearly unsound. Not only was the question admittedly raised below in the oral argument, but that court definitely passed upon this very point. Whether or not a trustee existed is the basic question upon which this case stands or falls, and it marks the dividing line between the majority and minority opinions in the court below. If the question had not been presented by counsel, it was definitely raised by the court itself, and this will not be its first consideration. By assigning the decree as error the theory upon which it was made—that Roland Pollock was a trustee—is necessarily opened to review: Heck-

man's Est., 236 Pa. 193. Furthermore, even if this question had not been presented or passed upon below, it would be our duty to determine it. Section 22(b) of the Orphans' Court Act of June 7, 1917, P. L. 363, provides: "The Supreme and Superior Courts of this Commonwealth shall, in all cases of appeal from the definitive sentence or decree of the orphans' court, hear, try and determine the same as to right and justice may belong, and decree according to the equity thereof;......" This act is an extension of the Act of June 16, 1836, P. L. 682, section 2, which reads as follows: "It shall be the duty of the Supreme Court of this Commonwealth, in all cases of appeals......taken from the decrees of the several orphans' courts, to hear, try, and determine the merits of such cases, and to decree according to the justice and equity thereof." We held, in Heckman's Est., supra, that under the Act of 1836, the court was bound to consider a question not raised below, but which went to the merits of the decree as made. This interpretation of the statute was reiterated after the passage of the aforesaid Act of 1917 in McCullough's Est., 292 Pa. 422, where we said, "The effect of this [provision] is to give opportunity for the determination of every basic question raised on an appeal by either side;......" The orphans' court is a court of equity; this court is enjoined by the statute to determine cases on appeal therefrom as to right and justice may belong; it would be highly inequitable, as well as a direct contravention of the statute, for this court to permit a serious mistake brought to its attention to continue, merely because the point was not raised in the court below.

It is also contended that since Roland Pollock considered himself a trustee and filed an account as such, he is foreclosed from now claiming that he is not. There is no merit in this contention. Merely thinking oneself a trustee does not make one such, if no trust was created. Where, in fact, a trust relationship does not exist, no mistaken assumption can change an absolute

ownership into a trust estate. The situation in Kirk-patrick's Est., 284 Pa. 583, was somewhat similar. In that case we held that where, in a will, an estate for life was given, the life tenant was not a trustee for the benefit of the remaindermen, although a decree was entered awarding the property to the life tenant "in trust for the purpose specified in will of deceased." The question of whether or not a trust existed was raised thirty years later, and we said, "This decree did not, however, fasten a trusteeship on the life tenant with respect to that property; to say 'in trust' was purely a gratuitous and voluntary statement on the part of the judge who made the decree......" A fortiori, in the case at bar, where the answer likewise depends upon a true interpretation of a will, if in fact there was no trust, the mere mistaken assumption that a trust existed cannot create one. The opinion of Roland Pollock and his counsel is not to be substituted for the will of the testator. It is not what they thought, it is what he did. The filing of an account as trustee, if in fact there was no trust, could not in any way impress a trust upon this stock. To hold otherwise would be a flagrant disregard of the intention of the testator.

The cardinal principle of testamentary construction is that the intention of the testator is to prevail, so far as it is disclosed by the language of the will: Stewart's Est., 253 Pa. 277. The will of Mr. Pollock clearly discloses his intention to give his business to his son. He gave him complete control of the business by making him the absolute owner of four-fifths of its capital stock. He attached one condition to the gift—that his son should pay his mother one-half of all dividends declared on the stock during her lifetime. It is clear he did so to assure his widow a sufficient income while she lived, his interest in the company being the chief asset of his estate. There is nothing in the language of the bequest, or in the circumstances surrounding it, which even remotely suggests that the testator wished to create a trust

of the stock. It is true that no set form of words is necessary to create a trust, but there is here no evidence of any intention so to do. The words are plain, unqualified, and their meaning is clearly apparent. There is no remainder over in case of nonperformance of the obligation; the gift is absolute. In all cases of acceptance of a gift made upon condition that the legatee pay certain debts or legacies, the legatee assumes a personal responsibility to pay; the relationship created is one of debtor and creditor: Fleming v. Fleming, 204 Pa. 648; Etter v. Greenawalt, 98 Pa. 422. It makes no difference if, as in this case, the legacy charged upon the gift is contingent —if and when dividends are declared—and not absolute. That he knew full well how to make a trust is demonstrated by the will itself. In it he created four trusts, in unmistakable language. The very fact that he did not use the same trust language in making this bequest to his son is proof of his intention to give him the stock absolutely. Had he here intended a trust he would have said so; it is but reasonable to presume he would have used words of trust as in the other cases.

This conclusion is further strengthened by a consideration of the circumstances of the case. Roland Pollock was an only son, he had been associated in the business for many years, and was the general manager of the company. He was a tried employee and his father trusted to his business acumen. It was to the interest of all concerned that he be free to manage the factory as he considered best, and for this and other reasons his father gave him the business. That such was the intention of her husband Mrs. Pollock certainly believed. In the agreement of February 8, 1923, which she signed, it is stated, "Whereas the parties to this agreement believe that it was the intention of said James Pollock, Deceased, that the said Roland D. Pollock should have complete control of said Pollock-Huston Company, subject only to the condition that said Margaret Pollock should, during the term of her life, receive one-half of the profits

of the Company distributed as dividends." And in her will, as above set out, she stated that Roland would receive upon her death the entire benefit of the stock "given to him in and by his father's will."

Since the control of the company was in Roland Pollock's hands, it was within his power to declare dividends when earned, or to withhold them. This does not mean that he could dam up profits and refuse to declare dividends, and thus prevent participation therein by his mother. But he did not do this. Large cash dividends were issued during the years the company made money. His refusal to declare a stock dividend unless he received all of it issued on the stock he held under the will cannot be said to have been a withholding of anything. He was under no obligation to pay out the large surplus in this way.

It is contended that Roland Pollock induced his mother to sign the agreement as a result of undue influence and coercion. The learned writer of the majority opinion in the court below uses the words "compelling" and "insisting." We do not find a word in the record to support such a conclusion. Roland very definitely told his mother that he would not declare the stock dividend unless she would relinquish her rights therein, and this he had a perfect right to do. She favored the expenditure of the surplus for expansion; she was quite as much interested in the continued welfare of the business as was her son. The surplus could have been used for that purpose without declaring a stock dividend, and she would have had no complaint. If she had refused to agree to Roland's proposition, the surplus could have been used anyway, and for a purpose with which she was fully in accord, and she would not have received any greater cash dividends. The agreement related only to the manner of making the surplus available. Fully informed of what was intended, she was in favor of the transaction. She knew her husband gave the business to Roland, and she was satisfied with the income from the

stock, which her husband provided for her. When Roland spoke to her about it she assented without demur, saying, as was testified, that it was all right so long as one-half the dividends on the new stock would be paid to her, that she did not want the stock, as it was no good to her, and furthermore, that she realized that it was only splitting the old stock into two parts, and not the creation of something new. Everything leads to the irresistible conclusion that the whole transaction was amicable, open, informal, and in the utmost good faith. As her lawyer testified concerning the agreement: "I was merely making a record of a thing that I never thought would in a remote way ever be questioned."

Furthermore, Mrs. Pollock, during the six years of her life after the signing of this agreement, never expressed any regret of the bargain then made. She never raised any question as to the interpretation then placed on the will of her husband—that Roland was to have all of the stock. Her daughters, who are the chief beneficiaries of her will and for whose benefit this action is brought, admitted that she had never complained of the arrangement. Once, it was testified, she said that she did not think that Roland was paying her enough dividends, but this related only to the cash income she was getting. To the day of her death she remained content with this arrangement whereby Roland had all the stock, and she received one-half of all cash dividends.

Since Mrs. Pollock was satisfied with her agreement, was intelligent and competent, had acted with full knowledge of all the facts, had legal advice and an opportunity to consult others, and never regretted her action in the six years of her life after the making of the agreement, it must be concluded that she joined with her husband in wishing their son to remain in complete control of the company and to own all of the stock of the business in the family. Under these circumstances, everything considered, we can see no reason why her daughters should be allowed, as legatees of their mother,

to upset her written agreement and go contrary to her will, to say nothing of that of their father.

Inasmuch as Roland D. Pollock was not a trustee, and was legally entitled to the entire stock dividend declared upon the 2,370 shares, because of the agreement with his mother, dated February 8, 1923, the account filed by him was improperly filed and stated, and should be returned to the files unaudited. It is not necessary to consider whether a proper measure of damage was applied in the court below, because there should have been no damages awarded.

The decree is reversed, and all costs incident to this proceeding are charged against the contestants.