PETER VAIRA AND MARY L. VAIRA, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 559–68. Filed September 24, 1969.

*Louis Vaira*, for the petitioners.
*Joseph M. Abele*, for the respondent.

OPINION

Most of the issues in this case rest upon factual determinations which have been difficult to make on the basis of the record. The evi-

dence presented on petitioners' behalf was disjointed and often confusing. In substantial measure, this was directly attributable to the fact that petitioners, due to their failure to keep records, were not able to produce any significant probative proof. The situation was compounded by the further element that petitioners' principal witness, Peter Vaira, was a difficult and largely unconvincing witness. The problems thus created are accentuated by the rule that the burden of proof is on petitioners. Rule 32, Tax Court Rules of Practice. It is against this background that we proceed to a discussion of each issue.

*Issue 1(a). The Unadjusted Cost Basis of the Inherited Property*

Peter's father, Frank Vaira, devised improved land to him on condition that he, together with his brother Steve, support their mother, Angelina, for life and on the further condition that he pay his brother Robert $2,000. Petitioners contend that Peter's unadjusted cost basis is the fair market value of the property at Frank's death *plus* the amounts expended by him in compliance with those conditions. Respondent contends that the actuarial value of the annuity to Angelina and the discounted value of the payments to Robert were in excess of the fair market value of the land at the time of Frank's death. He also asserts that, as a highly cost-conscious businessman, Peter would be unwilling to pay more for the property than it was worth. From this, respondent concludes that the payments to Peter's relatives were gifts to the extent that they exceeded such fair market value and that consequently Peter was a purchaser of the land from his father's estate with a cost basis under section 1012 equal to such fair market value. Cf. *Donald McDonald, Jr., Administrator*, 28 B.T.A. 64 (1933).

Initially, we will consider respondent's argument that part of Peter's payments to Angelina or for her benefit constituted gifts. The will merely provided that Peter "keep, provide, maintain, and support" his mother. As far as the gross amounts expended during 1941 to 1944 to finance the operation of a farm by Angelina are concerned, we have no way of determining, on the record before us, how much the farm contributed to Angelina's support. In any event, the most that it might have so contributed is the net profit from the operations and not the gross cost thereof. Similarly, capital expenditures by Peter for improvements to the house in which Angelina lived (even if we were able to determine the amount thereof) cannot be considered as being for Angelina's support particularly since they were made to property owned by his brother, Steve. Without categorizing the foregoing expenditures as gifts, loans, or otherwise, it is enough for us to hold that they were not made in discharge of the obligations imposed upon Peter by his father's will.[3]

---

[3] We note also that petitioners did not plead any of these expenditures in their petition, nor have they moved to amend the pleadings in this regard.

The obligation to pay Angelina $100 per month for life clearly falls in the support category and respondent does not contend that such expenditures were unreasonable. In 1940, the present value of a life annuity to Angelina was $8,080.04. Sec. 86.19(g), Regs. 108. Also in 1940, the present value of Robert's annuity due ($12.50 at the beginning of each of 160 months) was $1,560.53. Thus, by accepting the devise, Peter undertook obligations imposing an anticipated burden of $9,640.57 upon him. Respondent argues that when this is contrasted with the fair market value of what Peter received, which respondent calculates at $3,750,[4] it is obvious that Peter obligated himself to pay far more than he obtained from his father and that, since Peter was a cost-conscious businessman, the difference must be regarded as a gift and not as a part of Peter's cost.

Respondent valued the original Vaira tract by allocating the $9,800 according to acreage; yet Peter received an equal share of the intersection and actually received more road frontage, both on old Route 51 and on other roads, than Steve did. We therefore consider respondent's valuation unrealistic. *Fairfield Plaza, Inc.*, 39 T.C. 706, 712 (1963); *Biscayne Bay Islands Co.*, 23 B.T.A. 731, 735 (1931). Moreover, the $9,800, which the parties stipulated as the fair market value of the original Vaira tract, *did not include the value of improvements.* Yet, the land devised to Peter contained two service stations and a two-story brick residence, which Peter had built and in which he and his family lived.

Taking all of the various factors into consideration, we think that there was a substantial equivalence between the fair market value of what Peter received and the anticipated payments he undertook to make and that no part of those payments should be treated as gifts.

We now turn to the question whether Peter should be deemed to have acquired his share of the original Vaira tract from his father by devise or purchase or a combination thereof. Section 1012 provides in pertinent part that "The basis of property shall be the cost of such property, except as otherwise provided in this subchapter." One of the exceptions is contained in section 1014, which provides in pertinent part that "the basis of property acquired from a decedent shall * * * be the fair market value of the property at the date of decedent's death." Subsection (b)(1) of section 1014 specifies that property considered to have been acquired from a decedent shall include "Property acquired by devise, bequest, or inheritance."

Petitioners in effect contend that we should view Peter as a devisee of the entire property to the extent of its fair market value at the date of Frank's death and as a purchaser to the extent of the amounts

---

[4] Respondent arrives at this figure by taking the $9,800 valuation for the original Vaira tract at Frank's death and allocating 75/196 to Peter.

expended by him to fulfill the conditions of the devise. We disagree.

It is clear that, under Pennsylvania law, Peter, by accepting the devise, obligated himself to make the required payments to Angelina and Robert. *Logan* v. *Glass*, 136 Pa. Super. 221, 7 A. 2d 116 (1939), affirmed per curiam 338 Pa. 489, 14 A. 2d 306 (1940); *In Re Pollock's Estate*, 306 Pa. 301, 159 Atl. 555 (1932); *Renner* v. *Headley*, 129 Pa. 542, 18 Atl. 549 (1889). And, in all probability, the obligations also constituted a charge upon the land. *In Re Wise's Estate*, 188 Pa. 258, 41 Atl. 526 (1898). But whether there was merely a personal obligation or a charge upon the land or both is immaterial as far as this case is concerned.[5] The fact is that, from Peter's point of view, the land was effectively encumbered in his hands.

In *Crane* v. *Commissioner*, 331 U.S. 1 (1947), the Supreme Court considered at length the proper treatment of an encumbrance in determining the basis of property acquired by devise. In that case, the property involved was subject to a mortgage, the unpaid principal amount of which was not in excess of the date of death value of the property. The Supreme Court held that the basis of the property was its fair market value at the date of death unreduced by the amount of the encumbrance. In a tax sense, the amount of the encumbrance was already included in the basis.[6] See *Columbus & Greenville Railway Co.*, 42 T.C. 834, 847 (1964), affd. 358 F. 2d 294 (C.A. 5, 1966). This conclusion accorded with the legislative purpose underlying section 1014 and its predecessor—a purpose to prevent the imposition of an income tax on that part of an inheritance which represented appreciation in value while the property was in the hands of the decedent but to expose to income tax any increment in value represented by post-death appreciation.[7] It clearly requires rejection of petitioners' contention. The use of a combined basis of date-of-death value *plus* the amount of the obligations imposed upon Peter would insulate part of the subsequent appreciation in the value of the property from taxation, a result beyond the legislative intent.

The thesis that an obligation is merged in the basis to the extent of the date-of-death value is complicated where, as is the case herein, the obligation consists of annuities. In the usual case, the obligation is a

---

[5] The distinction between a personal obligation and a charge might be material in determining the basis of property in the hands of the decedent's estate, but this situation is not before us and we therefore express no opinion with respect thereto.

[6] This is a valid conclusion at least where the amount of the encumbrance is not in excess of the date-of-death value of the property. The Supreme Court left open the question as to what the rule would be if the amount of the encumbrance were greater. See 331 U.S. at 12. Compare *Parker* v. *Delaney*, 186 F. 2d 455, 458 (C.A. 1, 1950).

[7] This legislative history can be gleaned from the following sequence of pertinent sections of the statute, regulations, and committee reports. Revenue Act of 1918, sec. 213(b)(3), 40 Stat. 1057, 1065; art. 4, Regs. 33; art. 1562, Regs. 45; Revenue Act of 1921, sec. 202(a)(3), 42 Stat. 227, 229; H. Rept. No. 350, 67th Cong., 1st Sess., pp. 9–11 (1921); S. Rept. No. 275, 67th Cong., 1st Sess., pp. 10–11 (1921).

fixed amount and the extent of the merger can be precisely measured at the date of death. In the case of an annuity, the measurement can be made only in terms of the actuarial value of the annuity, whereas the amount of the basis in the property, in situations such as are involved herein, depends upon the payments actually made. See Rev. Rul. 55–119, 1955–1 C.B. 352, approved in *John C. W. Dix*, 46 T.C. 796 (1966), affirmed on another issue 392 F. 2d 313 (C.A. 4, 1968). But the fact that the nature of the beast, i.e., an annuity, is unusual does not preclude the application of the merger rationale.

We have determined that the value of what Peter received from his father was substantially the same as the amount of Peter's obligations, i.e., the anticipated payments to Angelina and Robert. See p. 995, *supra*. In effect, Peter was called upon to pay an amount equal to the value of what he got and by accepting the devise he agreed to make the required payments. In light of such equivalence, Peter in a very real sense purchased the property, with the result that under the particular circumstances of this case section 1012 controls to the exclusion of section 1014. This conclusion finds support in the cases which have synthesized the status of a devisee or legatee with that of a purchaser in the area of Federal income taxation. See *Commissioner* v. *Moore*, 207 F. 2d 265, 257 (C.A. 9, 1953), reversing 15 T.C. 906 (1950) ; [8] *Moffett v. Commissioner*, 191 F. 2d 149, 150 (C.A. 2, 1951), reversing in part 14 T.C. 445 (1950).[9] See also Opper, *J.*, dissenting in *Rosalie M. Schubert*, 33 T.C. 1048, 1057 (1960), affd. 286 F. 2d 573 (C.A. 4, 1961). Compare *In Re Wise's Estate, supra*. Whether, in the absence of substantial equivalence between the date of death value and the amount of the encumbrance, we would apply a split-level concept to an acquirer of property from a decedent (devisee or legatee in part *and* purchaser in part) is a question which we need not now decide. A somewhat similar question has presented difficulties in the area of acquisitions by gift, where, however, a specific regulation was involved, there was a statutory provision providing for an additive to basis of a portion of the gift tax paid, and there was evidence presented as to the presence or absence of donative intent.[10] Sec. 1015(a) ; sec. 1.1015–4, Income Tax Regs. E.g., *Richard H. Turner*, 49 T.C. 356 (1968), affirmed per curiam 410 F. 2d 752 (C.A. 6, 1969), and the cases discussed therein, where respondent urged the adoption of a part-sale, part-gift concept; *Kauf-*

---

[8] This reversal was accepted and followed in *Albert L. Rowan*, 22 T.C. 865, 874 (1954).

[9] See *Jules S. Bache Trust*, 24 T.C. 960, 965 (1955), affirmed per curiam 239 F. 2d 385 (C.A. 2, 1956), in which our decision in *Moffett* was "confined to the specified facts therein."

[10] Compare fn. 6, *supra;* compare also respondent's recognition of a dual status where a legatee or devisee receives an option from a decedent to acquire property at less than its date-of-death value. Rev. Rul. 67–96, 1967–1 C.B. 196. But compare the decided cases discussed in that ruling and *Valleskey* v. *Nelson*, 168 F. Supp. 636 (E.D. Wis. 1958), affd. 271 F. 2d 6 (C.A. 7, 1959).

*man's, Inc.*, 28 T.C. 1179, 1187 (1957). See *Winthrop M. Crane III*, 45 T.C. 397, 405, fn. 1 (1966), and affirmance 368 F. 2d 800, 801 (C.A. 1, 1966); Wurzel, "The Tax Basis for Assorted Bargain Purchases or: The Inordinate Cost 'Ersatz' Legislation," 20 Tax L. Rev. 165, 177 et seq. (1964).

We turn now to a determination of Peter's cost. Basically what happened is that Peter acquired the land upon the death of his father in exchange for an agreement to pay a life annuity to Angelina and a term annuity to Robert. Both annuities were fully paid by the time of Peter's receipt in 1959 of the first portion of the proceeds of his involuntary disposition by way of the condemnation.[11] Under these circumstances, his basis can be determined in the same manner as that of a person who purchases property against a commitment to pay an annuity to the seller where the annuitant dies before that person has disposed of the property—namely, the amount actually paid in satisfaction of the commitment. *D. Bruce Forrester*, 4 T.C. 907 (1945); Rev. Rul. 55–119, *supra*.

Robert was paid $2,000, but there is some dispute as to how much Peter paid Angelina. The only material evidence in the record is Peter's testimony that he "paid it up until 1959." Respondent argues that this must be read as "until December 31, 1958." But Angelina did not release her interest to the Commonwealth of Pennsylvania until April of 1959. We conclude, from the evidence before us, that the payments did not cease until that time. We have therefore found that Peter paid his mother $100 per month from October of 1940 through March of 1959, for a total of $22,200. As a result, we hold that Peter's unadjusted cost basis in his share of the original Vaira tract was $24,200.

*Issue 1(b).  Allocation of Unadjusted Basis to Condemned Property*

Of the 75 acres, only 14.56 were condemned; the $24,200 basis must be equitably apportioned between the part condemned and the part remaining. Sec. 1.61–6(a), Income Tax Regs. Here, too, respondent would allocate purely according to acreage. Again we disagree. A considerable part of the value of Peter's land appears to have inhered in the property at the intersection and in the other frontage along the old Route 51. It was precisely this portion of the land that was condemned. We therefore think it more realistic to allocate half of the basis to the condemned land than to allocate according to acreage. We hold that Peter's unadjusted basis in the condemned land (not including improvements) was $12,100.

---

[11] Angelina released her interest to the Commonwealth of Pennsylvania in April 1959 and there is no evidence of any payments to her after that date.

### Issue 1(c). Adjustments to Basis for Improvements

In 1954, Peter made expenditures to establish the private-brand service station. However, after the land was condemned, he successfully moved the tanks, pumps, and building to other service stations. Consequently, only the installation cost of the tanks and pumps can be considered for the purpose of decision herein. The record does not specifically reveal what that cost was; however, doing the best we can with the evidence submitted, we are satisfied that it was $1,500, and we have so found.

Peter has never taken depreciation deductions on his income tax returns. But the amount allowable as depreciation deductions must nonetheless be subtracted from his basis. Sec. 1016(a)(2); sec. 1.1016-3(a)(2), Income Tax Regs. We are satisfied that the useful life of the improvement was 25 years. See Bulletin F. Peter's basis in the installation costs must therefore be decreased by $300, representing 5 years of straight-line depreciation, leaving him an adjusted basis of $1,200 in the installation costs.

In 1957, Peter constructed a concrete-block building at the old Gulf station to replace a building which had burned down. This building was destroyed as a result of the condemnation. Proof of cost and useful life is also not completely satisfactory. Again, doing the best we can with the evidence at hand, we have found a cost of $7,750 and a 25-year life. This amount must be decreased by $620 for 2 years of straight-line depreciation, leaving an adjusted basis of $7,130.

We hold that Peter's adjusted basis in the condemned land and improvements was $20,430, consisting of $12,100 unadjusted cost of the condemned land, $1,200 in the unrecovered cost of the private-brand service station improvements, and $7,130 in the unrecovered cost of the old Gulf station improvements.

### Issue 2. Severance Damages

Petitioners contend that the $83,772.88 received in 1962 represented payment for damage to the remaining land rather than compensation for the land taken and that such payments are nontaxable. We disagree.

Payments attributable to the land remaining after a condemnation are applied in reduction of the basis of that land; to the extent the payments exceed the basis, they are realized gain, despite the absence of a "disposition" of the property. Sec. 1.1001-1(c), Income Tax Regs.; G.C.M. 23698, 1943 C.B. 1940, modified by Rev. Rul. 68-37, 1968-1 C.B. 359. Such gain may technically not be recognized under section 1002, but it is nonetheless includable in gross income under sections 61 and 1231.

We will assume for the purposes of decision that under Pennsylvania law, as it existed during the taxable years 1959 and 1962,[12] a condemnation award could be made only in a lump sum representing the value of the land actually taken and that it could not recite any amount as severance damages. E.g., *Brown* v. *Commissioner*, 399 Pa. 156, 159 A. 2d 881 (1960). But it does not follow that a Pennsylvania condemnation award necessarily cannot reflect an element of severance damages. *Arch B. Johnston*, 42 T.C. 880 (1964). The test to be applied is whether the condemnation proceedings, including negotiations by way of settlement, clearly show that compensation for damage to the remaining land was in fact included. Compare *Arch B. Johnston, supra*, *L. A. Beeghly*, 36 T.C. 154 (1961), and *Pioneer Real Estate Co.*, 47 B.T.A. 886 (1942), modified on another ground by a Supplemental Memorandum Opinion, see 1 T.C.M. 527, with *Lapham* v. *United States*, 178 F. 2d 994, 996 (C.A. 2, 1950), *Marshall C. Allaben*, 35 B.T.A. 327 (1937), and *Estate of Edgar S. Appleby*, 41 B.T.A. 18, 22 (1940), affirmed on another issue 123 F. 2d 700 (C.A. 2, 1941) ; see 3 Mertens, Law of Federal Income Taxation, sec. 20.174 (Zimet & Weiss rev.). The facts herein simply do not meet the standard laid down by the decided cases.

While there was some testimony that the presence of cuts and fills required extensive excavation and grading in order to provide Peter's remaining land with usable frontage, there is no indication of the monetary measure of such damage in the transcript of the proceedings before the board of viewers, and the report of the viewers merely states that, in determining the damages sustained by Peter, consideration was given to "the quantity, quality and value *of the land so taken.*" (Emphasis added.) Nor can we accept petitioners' argument that Peter's loss of frontage, which was the subject of testimony at the condemnation hearing, should be treated as constituting the basis for determining that a portion of the award constituted severance damage. If the Commonwealth had built the new highway on the roadbed of the old, cutting below the level of Peter's land, petitioners could with reason complain that the frontage had been made unusable by the condemnation and that it had therefore decreased in value. But this was not what happened. The Commonwealth took a broad swath of land, nowhere less than 85 feet, immediately to the west of the old highway and built the new highway on it. The value of Peter's frontage on the old Route 51 inhered in the land that was taken (except for that part which inhered, and still inheres, in area E, which acquired new frontage at least as valuable as the old). The land behind lost no value as frontage, since it never *was* frontage. The frontage that

---

[12] Since 1964, Pennsylvania has permitted an express allowance of severance damages. See Pa. Stat. Ann. tit 26 sec. 1–511(6) (1964).

existed before the condemnation was not made unusable; *it was condemned.* Compare *Lapham* v. *United States,* 178 F. 2d 994, 996 (C.A. 2, 1950). By a parity of reasoning, Peter's loss of corner property at a grade intersection is not damage to property which never was at an intersection.

Petitioners' argument for severance damages based on loss of frontage and corner property, if it proves anything, supports the conclusion that the damages were attributable to the land taken, which included the frontage and corner property, rather than to the more remote remaining land. On the record herein, we hold that petitioners have failed to show that any part of the award is properly attributable to the land remaining after the condemnation.[13]

## *Issue 3.   Section 1033*

In their 1959 income tax return, petitioners elected under section 1033 (a) (3) [14] not to recognize the major part of the gain realized from the condemnation. Petitioners did not seek an extension, and so the period within which the property had to be replaced expired on December 31, 1960. Sec. 1033 (a) (3) (B) (i).

---

[13] Respondent makes no claim that any part of the award received in 1962 should be taxed as ordinary income, and not as part of the amount realized, despite the recitation in the report that the award included some unspecified amount as damages for delay in payment. See *Kieselbach* v. *Commissioner,* 317 U.S. 399 (1943).

[14] SEC. 1033. INVOLUNTARY CONVERSIONS.

(a) GENERAL RULE.—If property (as a result of its destruction in whole or in part, theft, seizure, or requisition or condemnation or threat or imminence thereof) is compulsorily or involuntarily converted—

\*      \*      \*      \*      \*      \*

(3) CONVERSION INTO MONEY WHERE DISPOSITION OCCURRED AFTER 1950.—Into money or into property not similar or related in service or use to the converted property, and the disposition of the converted property (as defined in paragraph (2)) occurred after December 31, 1950, the gain (if any) shall be recognized except to the extent hereinafter provided in this paragraph :

(A) NONRECOGNITION OF GAIN.—If the taxpayer during the period specified in subparagraph (B), for the purpose of replacing the property so converted, purchases other property similar or related in service or use to the property so converted, or purchases stock in the acquisition of control of a corporation owning such other property, at the election of the taxpayer the gain shall be recognized only to the extent that the amount realized upon such conversion (regardless of whether such amount is received in one or more taxable years) exceeds the cost of such other property or such stock. Such election shall be made at such time and in such manner as the Secretary or his delegate may by regulations prescribe. \* \* \*

\*      \*      \*      \*      \*      \*

(B) PERIOD WITHIN WHICH PROPERTY MUST BE REPLACED.—The period referred to in subparagraph (A) shall be the period beginning with the date of the disposition of the converted property or the earliest date of the threat or imminence of requisition or condemnation of the converted property, whichever is the earlier, and ending—

(i) one year after the close of the first taxable year in which any part of the gain upon the conversion is realized, or

(ii) subject to such terms and conditions as may be specified by the Secretary or his delegate, at the close of such later date as the Secretary or his delegate may designate on application by the taxpayer. Such application shall be made at such time and in such manner as the Secretary or his delegate may by regulations prescribe.

At the outset, we again emphasize that Peter kept no records of his cost. The bulk of the testimony both as to time and amount of expenditure was based on estimates made long after the fact. This was particularly true with respect to expenditures for excavating and grading, where the only bills submitted were those of two contractors showing no payments or charges for this purpose prior to 1963. Moreover, the testimony indicates that a considerable portion of the work in connection with the claimed replacements was done by Peter himself. It is well established that the value of Peter's services may not be considered an expenditure. Cf. *Marks* v. *Commissioner*, 390 F. 2d 598 (C.A. 9, 1968), affirming a Memorandum Opinion of this Court; *Palmer Hutcheson*, 17 T.C. 14 (1951). Under these circumstances, and bearing heavily on the petitioners (*Cohan* v. *Commissioner*, 39 F. 2d 540 (C.A. 2, 1930)), we have done the best we could with the evidence before us and found, as our Findings of Fact show, that Peter expended at most an aggregate of $20,188 prior to December 31, 1960, consisting of $800 for the used Esso tanks, $3,500 for the area B service station, $5,000 for the Roberts Hollow station, $8,100 for excavating and grading area D, $1,588 for excavating and grading area E, and $1,200 for construction of the new Gulf station on the latter site.[15]

Peter's adjusted basis in the condemned property has been found to be $20,430. Since the maximum expenditures on his part during the taxable years 1959 and 1960 aggregate a lesser amount, no part of the gain realized in 1959 is insulated from recognition by section 1033. See sec. 1033(a)(3)(A).

As a consequence of the foregoing, we need not reach various other issues raised herein, to wit: (1) Whether the expenditures to make area D commercially usable qualify as a "purchase" for the purpose of "replacing" the condemned property[16] (compare Rev. Rul. 271, 1953–2 C.B. 36; Rev. Rul. 60–69, 1960–1 C.B. 294; Rev. Rul. 67–255, 1967–2 C.B. 270); (2) whether the construction without completion during 1959 and 1960 of the new Gulf station on area E qualified as a replacement under section 1033; (3) whether the Roberts Hollow service station similarly qualified in light of the manner in which petitioners made their election on their 1959 return (compare *Adolph K. Feinberg*, 45 T.C. 635, 642–643 (1966), affd. 377 F. 2d 21 (C.A. 8, 1967)).[17]

---

[15] It will be recalled that areas E and A are considered synonymous. (See fn. 2, *supra*.) Our Findings of Fact show that we were unable to make a determination that any expenditures were made on area C during the critical period.

[16] At the trial, petitioners were warned of the need to amend their pleadings if they wished to pursue this issue, but they did not make any motion in this regard and they seem to have abandoned this issue on brief.

[17] Respondent conceded that there was no issue arising from the fact that two of the new stations were on leased property rather than on Peter's own land and that construction of a building can constitute the "purchase" of property within the meaning of sec. 1033.

## Issue 4.   Witness Fee

In March 1963, Peter paid $1,350 to an expert witness for services rendered at the condemnation hearing in 1962. The parties agree that this fee was a capital expenditure. *Isaac G. Johnson & Co.* v. *United States*, 149 F. 2d 851 (C.A. 2, 1945); see *Arthur T. Galt*, 19 T.C. 892, 912 (1953), modified on other issues 216 F. 2d 41 (C.A. 7, 1954). But petitioners claim that it should be included in the basis of the condemned land for purposes of computing the gain realized in 1959. Respondent argues that it can only be taken as a capital loss in 1963, when it was paid. We agree with respondent.

Federal income tax is computed on the basis of an annual accounting. *Burnet* v. *Sanford & Brooks Co.*, 282 U.S. 359 (1931). Petitioners reported their income on the cash basis and must accept the interaction of their method of reporting with the requirement of an annual accounting. The witness fee was paid in 1963 and can only be used by a cash basis taxpayer for tax purposes in that year, if at all. We hold that the $1,350 paid in 1963 cannot be taken as an offset to gain realized in earlier years. Cf. *Roberta Pittman*, 14 T.C. 449 (1950). Compare *Arrowsmith* v. *Commissioner*, 344 U.S. 6 (1952). Respondent's notice of deficiency included 1963, but petitioners failed to appeal from this portion of his determination. We therefore have no jurisdiction over that year. Sec. 6214(b); *John R. Thompson Co.*, 10 B.T.A. 57 (1928).

## Issue 5.   Statute of Limitations

This issue involves the question whether section 6501(a) bars the assessment of any deficiency for 1959. Section 1033(a)(3)(C) supersedes the general limitation period of section 6501(a) by providing:

If a taxpayer has made the election provided in subparagraph (A), then—
(i) the statutory period for the assessment of any deficiency, for any taxable year in which any part of the gain on such conversion is realized, attributable to such gain shall not expire prior to the expiration of 3 years from the date the Secretary or his delegate is notified by the taxpayer (in such manner as the Secretary or his delegate may by regulations prescribe) of the replacement of the converted property or of an intention not to replace, * * *

Petitioners made an election under section 1033(a)(3)(A), part of the gain was realized in 1959, and the entire deficiency herein is attributable to such gain. At no time did petitioners attempt to comply with the applicable regulations; they never gave any notification. See sec. 1.1033(a)–2(c)(5), Income Tax Regs. We hold that assessment of the deficiency for 1959 is not barred by any provision of the Code.

## Issue 6.   Additions to Tax Under Section 6653(a)

Respondent determined an addition to the tax under section 6653(a) for both 1959 and 1962. The burden of proof rests upon the petitioners. *David Courtney*, 28 T.C. 658, 669–670 (1957).

Petitioners' return for 1959 estimated that Peter would spend $78,667 by the end of 1960 upon service stations to replace those condemned. Peter and the accountant who prepared the return worked out this estimate together. Yet Peter failed to keep any records whatever of the amounts expended upon the replacement properties. Moreover, he failed to notify respondent of his failure to complete the replacements by the end of 1960 and to file an amended return for 1959, as he was required to do by respondent's regulations. See sections 1.1033(a)–2(c)(2) and 1.1033(a)–2(c)(5), Income Tax Regs. Petitioners argue that Peter relied upon the accountant's advice. But the evidence shows that this at best applies to the return as initially filed. Petitioners do not even suggest that the accountant told Peter that it did not matter how much he actually spent or that Peter relied upon the accountant to prepare and file the necessary notification and amended return. In several respects, therefore, the situation herein is quite different from that which prevailed in *Conlorez Corp.*, 51 T.C. 467 (1968). We hold that the addition to tax for 1959 is proper.

With respect to 1962, the petition alleges that the $83,772.88 receipt was not reported because it was "nontaxable severance damages." [18] Peter testified that the accountant knew about the receipt. But he did not testify that his accountant advised him that the money was "nontaxable severance damages" nor that he relied upon any such advice which might have furnished the basis for a finding of honest misunderstanding of the law. Moreover, even if the amount received in 1962 had constituted severance damages, the substantial portion thereof, which was in excess of Peter's basis in the remaining land, would have been taxable. See pp. 999–1000, *supra*. Under all of the circumstances, we think Peter failed to exercise reasonable care in assuring that the return included all substantial items of income and that consequently the addition to tax for 1962 is proper. *Vern W. Bailey*, 21 T.C. 678, 687 (1954).

## Issue 7.   Addition to Tax for Late Filing of 1962 Return

Respondent determined an addition to the tax under section 6651 [19] for 1962, arguing that the filing of an unsigned form does not con-

---

[18] Clearly, sec. 1033 was inapplicable because the replacement period had expired and because, in any event, Peter had not indicated in his 1959 return that he would so spend any portion of the award in excess of the amount received in that year.

[19] SEC. 6651. FAILURE TO FILE TAX RETURN.

(a) ADDITION TO THE TAX.—In case of failure to file any return required under authority of subchapter A of chapter 61 (other than part III thereof), of subchapter A of chapter 51 (relating to distilled spirits, wines, and beer), or of subchapter A of chapter 52 (relating

stitute the filing of a return and that inadvertent failure to sign does not constitute "reasonable cause." We agree.

Until 1942, taxpayers had to make their returns under oath. Under such a statute, a return form unsigned and unsupported by oath obviously could not constitute a valid return. *Lucas* v. *Pilliod Lumber Co.*, 281 U.S. 245 (1930); *Theodore R. Plunkett*, 41 B.T.A. 700, 710–711 (1940), affd. 118 F. 2d 644 (C.A. 1, 1941). The 1942 Revenue Act did away with the oath requirement so far as individuals were concerned and in its place substituted a written verification subject to the penalties of perjury. 56 Stat. 798, 836. This provision is now embodied in section 6065. Congress made this change merely to avoid inconvenience to taxpayers; there was no intention of changing the result reached in *Lucas* v. *Pilliod Lumber Co.*, *supra*. See S. Rept. No. 1631, 77th Cong., 2d Sess., pp. 5, 107 (1942). Moreover, sections 6061, 6062, and 6063 require all returns to be signed. See also section 7206. Yet no specific penalty is provided for a failure to sign. We recognize that the unsigned return was accompanied by a signed check. But neither the signature on the check nor the acceptance of the check by respondent can be considered an imputed signature on the return itself. Cf. *Roy Dixon*, 28 T.C. 338, 342, 346–348 (1957); see *Brafman* v. *United States*, 384 F. 2d 863, 868 (C.A. 5, 1967). It is hardly conceivable that such a procedure would be sufficient to support a perjury charge based on a false return—one of the principal sanctions available to assure that honest returns are filed. See *Reaves* v. *Commissioner*, 295 F. 2d 336, 338 (C.A. 5, 1961), affirming 31 T.C. 690 (1958). We can only construe this to mean that an unsigned return is no return at all.[20] See *Roy Dixon*, 28 T.C. at 347.

The next question is whether petitioners' failure to sign the return was "due to reasonable cause and not due to willful neglect." We have found as a fact that petitioners' failure to sign the return was not due to willful neglect. But the absence of willful neglect is insufficient

---

to tobacco, cigars, cigarettes, and cigarette papers and tubes), or of subchapter A of Chapter 53 (relating to machine guns and certain other firearms), on the date prescribed therefor (determined with regard to any extension of time for filing), unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the amount required to be shown as tax on such return 5 percent of the amount of such tax if the failure is for not more than 1 month, with an additional 5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate.

(b) PENALTY IMPOSED ON NET AMOUNT DUE.—For purposes of subsection (a), the amount of tax required to be shown on the return shall be reduced by the amount of any part of the tax which is paid on or before the date prescribed for payment of the tax and by the amount of any credit against the tax which may be claimed upon the return.

[20] Respondent makes no claim that petitioners' failure to sign the return form precludes them from using the joint-return rates permitted by sec. 2,

to avoid the addition; reasonable cause must be shown. *Coshocton Securities Co.*, 26 T.C. 935, 939 (1956). Petitioners' only excuse for failing to sign the return is that they "overlooked" it. This is not reasonable cause within the meaning of the statute. Cf. *Theodore R. Plunkett, supra; Rogers Hornsby*, 26 B.T.A. 591, 593 (1932); see *Veterans Foundation*, 38 T.C. 66, 75 (1962), affirmed on other issues 317 F. 2d 456 (C.A. 10, 1963). We hold that an addition to the tax for 1962 under section 6651 is proper.

*Decision will be entered under Rule 50.*