T.C. Memo. 2001-36

UNITED STATES TAX COURT

JUAN RODRIGUEZ, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 4624-97.          Filed February 14, 2001.

Juan Rodriguez, pro se.

<u>George D. Curran</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

WHALEN, <u>Judge</u>:  Respondent determined the following
deficiencies in, additions to, and penalty with respect to
petitioner's Federal income tax for 1990, 1991, and 1993:

| Year | Deficiency | Penalty and Addition to Tax | | |
|---|---|---|---|---|
| | | Sec. 6651(a) | Sec. 6554 | Sec. 6662(a) |
| 1990 | $2,284 | $571 | $150 | -0- |
| 1991 | 2,374 | -0- | -0- | $475 |
| 1993 | 24,654 | 6,164 | 1,035 | -0- |

After concessions, the issues for decision are: (1) Whether petitioner is entitled to deduct wagering losses in the amount of $19,690 for the taxable year 1991; (2) whether petitioner must include in gross income a payment in the amount of $100,000 that he received during 1993 from the Federal Bureau of Investigation (FBI) and, if so, whether he is entitled to deduct a portion of such amount as relocation expenses; (3) whether petitioner is liable for the accuracy-related penalty under section 6662(a) for the taxable year 1991; (4) whether petitioner is liable for the addition to tax under section 6651(a)(1) for failure to file a timely return for 1993; and (5) whether petitioner is liable for the addition to tax under section 6654 for failure to pay estimated income tax for the taxable year 1993. Unless stated otherwise, all section references in this opinion are to the Internal Revenue Code as in effect during the years in issue.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits

are incorporated herein by this reference. Petitioner resided in Philadelphia, Pennsylvania, when he filed his petition in this case.

At one time, petitioner operated an illegal bookmaking business that was frequented by a number of drug dealers. In 1987, he was arrested by the FBI while acting as a middleman in a transaction involving the purchase and sale of two kilograms of cocaine. The criminal drug charges stemming from his arrest carried a maximum prison sentence of 80 years and fines of $2 million. In order to avoid incarceration on such charges, petitioner pleaded guilty to a narcotics charge and agreed to work as an undercover informant for the Philadelphia office of the FBI. In return, the FBI agreed to bring petitioner's cooperation to the attention of the judge at the time of sentencing.

In March 1988, petitioner and the FBI initiated an undercover investigation of money laundering and drug trafficking in the Philadelphia area. The investigation was assigned the code name Metroliner. The investigation took place at petitioner's off-track betting parlor where petitioner also conducted his illegal bookmaking operation.

Petitioner played a central role in the investigation. He introduced five undercover FBI agents to drug traffickers, money launderers, and gamblers. He made over

150 tape recordings, both audio and video, documenting 72 transactions consisting of 23 drug purchases and 49 money laundering transactions. While under surveillance, subjects of the investigation purchased 31 kilograms of cocaine and laundered $5 million in drug proceeds from seven different drug organizations operating in and around Philadelphia. As a result of the Metroliner investigation, 91 persons were indicted and $2.5 million was seized. Petitioner testified in five trials, the last of which ended in July 1993. Ultimately, because of his cooperation, petitioner was sentenced to 5 years' probation on the drug charges mentioned above.

During 1991 or 1992, operation Metroliner was terminated upon short notice. Due to the circumstances surrounding the termination of the undercover investigation, petitioner lost certain personal property, including a safe containing some of his personal records. After the investigation was terminated, petitioner declined to enter the witness protection program.

The FBI paid petitioner subsistence and other expenses while the FBI's investigation continued. Generally, this consisted of monthly payments, that began at $1,500 in 1991, and increased to $2,000 in 1992, and further increased to $3,000 in the middle part of 1992 when the

indictments were unsealed and petitioner became a witness for the Government.  These payments ended in the summer of 1993 at the conclusion of the last trial.

Mr. Paul D. Allen, Jr., Supervisory Special Agent of the FBI, wrote a letter to the United States Attorney's Office, dated July 7, 1993, stating that between October 1987 and the present "Mr. Rodriguez has been paid by the FBI a total  of $84,424.77 all of which has been for expenses."  Mr. Allen's letter further states:

> These expenses were for items such as rent, utilities, food/subsistence, transportation (automobile, gas, oil, tolls, maintenance, insurance), clothing, child support, medical/dental and other miscellaneous living expenses.

In a letter to the Internal Revenue Service, dated March 27, 1995, Mr. Allen stated: "Mr. Rodriguez was paid a total of $75,400.00, all of which was considered to be reimbursement for expenses he incurred during the investigation."

Petitioner executed receipts for expense reimbursements in the aggregate amount of $81,732.30.  Three of the receipts, totaling $4,500, are dated after July 7, 1993, the date of Mr. Allen's letter to the United States Attorney's Office mentioned above.

Based upon petitioner's cooperation in the Metroliner investigation and his testimony during the criminal trials, the FBI made a lump-sum payment to petitioner of $100,000. A telex from the Philadelphia office of the FBI requesting the Director of the FBI to authorize the payment states as follows:

> REQUEST OF THE BUREAU: BUREAU AUTHORITY IS REQUESTED TO EFFECT A LUMP SUM PAYMENT OF $100,000 TO CAPTIONED COOPERATING WITNESS (CW) FOR HIS COOPERATION IN PHFILE 245B-PH-224 ENTITLED "METROLINER". THIS LUMP SUM PAYMENT REPRESENTS A SHARE OF THE VALUE OF UNITED STATES CURRENCY, CERTIFICATES OF DEPOSIT, VEHICLES, RESIDENCES, FARMS, AND BUSINESS LOCATIONS SEIZED AS A DIRECT RESULT OF THE COOPERATION FURNISHED BY THE [COOPERATING WITNESS].

Mr. Allen's letter of March 27, 1995, to the Internal Revenue Service describes this payment as follows:

> At the conclusion of the case, Mr. Rodriguez was paid a lump sum of $100,000. These funds were to offset relocation expenses and compensate Mr. Rodriguez for his efforts during the investigation.

Mr. John R. Thomas, Special Agent of the FBI, stated in a letter dated May 16, 1995, to a revenue agent of the Internal Revenue Service, that the lump-sum payment given to petitioner at the conclusion of the case was "for any and all claims he may have had, to include: services rendered, relocation, reimbursement for reasonable and

necessary authorized expenditures, and the like. Our files do not disclose an allocation of these funds."

Petitioner executed a receipt on or about September 30, 1993, which states as follows: "On this date I, Tony Rodriguez, received $100,000 from the FBI as witnessed by the two Special Agents of the FBI whose signatures appear below mine." At that time, petitioner actually received a cash payment of $90,000 and the cancellation of an advance of $10,000 that had previously been made on August 6, 1993, in anticipation of the lump-sum payment. The receipt for the advance payment that was executed by petitioner states that it was paid "for services".

Petitioner expected to receive more than the $100,000 from the FBI. His understanding was that the FBI could pay him a maximum of $250,000. He expected the FBI to pay him the maximum amount because the operation had been so successful. He later sued the FBI and six agents of the FBI in the United States District Court for the Eastern District of Pennsylvania attempting to obtain more money. His suit was transferred by the District Court to the United States Court of Federal Claims. See Rodriguez v. FBI, 876 F. Supp. 706 (E.D. Pa. 1995). His suit was unsuccessful.

While the undercover investigation was ongoing, petitioner was permitted to continue his illegal bookmaking business and to retain the net proceeds from that business. Petitioner also continued his gambling activities, including betting at various racetracks and casinos. During that time, petitioner received sizeable winnings and incurred sizeable losses from his gambling activities. Special Agents of the FBI were aware of petitioner's gambling at racetracks and casinos.

Petitioner attached to his 1991 Federal income tax return 10 Statements for Certain Gambling Winnings on Form W-2G that report the following gross winnings, Federal and State tax withholding, and net winnings from three racetracks:

| | Date | Gross Winnings | Fed. Tax Wheld. | St. Tax Wheld. | Net Winnings |
|---|---|---|---|---|---|
| N.J. State Sports & Exposition Auth. | 01/08/91 | $8,140.00 | $1,626 | $244 | $6,270.00 |
| N.J. State Sports & Exposition Auth. | 01/12/91 | 5,527.50 | 1,105 | 166 | 4,256.50 |
| N.J. State Sports & Exposition Auth. | 03/09/91 | 626.20 | -0- | -0- | 626.20 |
| N.J. State Sports & Exposition Auth. | 03/09/91 | 626.20 | -0- | -0- | 626.20 |
| Garden State Race Track, Inc. | 05/16/91 | 652.80 | -0- | -0- | 652.80 |
| N.J. State Sports & Exposition Auth. | 05/30/91 | 685.00 | -0- | -0- | 685.00 |
| Philadelphia Park - GRI | 06/28/91 | 2,241.50 | 447 | -0- | 1,794.50 |
| Philadelphia Park - GRI | 07/30/91 | 1,801.20 | 359 | -0- | 1,442.20 |
| N.J. State Sports & Exposition Auth. | 08/01/91 | 918.60 | -0- | -0- | 918.60 |
| Philadelphia Park - GRI | 11/11/91 | 812.60 | -0- | -0- | 812.60 |
| | | 22,031.60 | 3,537 | 410 | 18,084.60 |

Petitioner also attached a handwritten schedule to his 1991 return that lists 9 of the 10 payments reported on the Forms W-2G. The handwritten schedule does not list the

payment from Garden State Race Track, Inc., shown above, in the amount of $652.80.

On line 22 of his 1991 return, petitioner reported other income from "Race Track" in the amount of $21,379. This amount is $652.60 less than the aggregate winnings reported on the Forms W-2G attached to his return. The record does not explain why petitioner reported only $21,379 of the $22,031.60 shown on the Forms W-2G that are attached to petitioner's return. Petitioner reported no income from his gambling at casinos or from his other gambling activities.

For taxable year 1991, petitioner claimed a deduction for "gambling losses" in the amount of $19,690. Petitioner's return does not give any details concerning this deduction, such as the identity of the payees, the dates, or the amounts paid. This amount is claimed as miscellaneous itemized deduction. Thus, petitioner's 1991 return does not claim that petitioner is in the trade or business of gambling. Petitioner also claimed a credit of $3,537, the aggregate amount of Federal tax withheld from the winnings reported on the Forms W-2G attached to his return.

Petitioner never filed a Federal income tax return for 1993. Respondent prepared a return for that year, which determined that petitioner owed tax on the $100,000 lump-sum payment.

In the subject notice of deficiency, respondent made adjustments to petitioner's income for 1990, 1991, and 1993. The adjustments for 1990 were resolved by the parties and are no longer at issue in this proceeding. Respondent made the following adjustments to petitioner's taxable income for 1991 and 1993:

|  | 1991 | 1993 |
|---|---|---|
| Exemptions | -0- | ($2,350) |
| Compensation (FBI) | -0- | 100,000 |
| Itemized deduction/ standard deduction | $16,290 | (3,700) |
| Total adjustments | 16,290 | 93,950 |

The notice describes the adjustment disallowing the gambling losses claimed in 1991 as follows:

> For the taxable year ending December 31, 1991, you have failed to substantiate the claimed gambling losses of $19,690. Since this was the only claimed itemized deduction, you are now entitled to the standard deduction of $3,400. Accordingly, your taxable income is increased $16,290.

The notice describes the adjustment increasing petitioner's compensation from the FBI in 1993, as follows:

Compensation you received from the Federal
Bureau of Investigation for services rendered
in [sic] includible in income.  Accordingly,
your taxable income for 1993 is increased
$100,000.

OPINION

Petitioner asks the Court to redetermine two of the adjustments made in the subject notice of deficiency, the disallowance of gambling losses in 1991 in the amount of $19,690, and the inclusion in gross income of the lump-sum payment of $100,000 from the FBI in 1993.  Petitioner also seeks redetermination of the accuracy-related penalty under section 6662(a) for tax year 1991 in the amount of $475, and of the addition to tax under section 6651(a)(1) in the amount of $6,164 for failure to timely file his return for tax year 1993.

At trial, petitioner presented no evidence regarding the addition to tax under section 6654 for failure to pay estimated tax with respect to his 1993 tax, and he made no reference to it in his posttrial brief.  Therefore, we consider this issue waived or abandoned.  See Bradley v. Commissioner, 100 T.C. 367, 370 (1993) ("Petitioner has not pursued this line of objection on brief, and we consider it abandoned.").  We hereby sustain respondent's determination with respect to the addition to tax under section 6654 for 1993.

Wagering Loss Deduction

The first issue for decision is whether petitioner is entitled to deduct wagering losses in the amount of $19,690 for the taxable year 1991. As noted above, respondent disallowed all of the wagering losses claimed by petitioner because petitioner had failed to substantiate the deduction. In his posttrial brief, petitioner acknowledges that he did not substantiate this deduction, but he argues that some amount should be allowed as a deduction. His brief states as follows: "Although it is true the petitioner did not produce complete and accurate records of gambling losses after seven years time, some allowance should have been made for the losses sustained". Respondent argues that petitioner did not prove the amount of his gambling losses or that his gambling losses exceeded the amount of his unreported gambling winnings.

Section 165(d) allows taxpayers to deduct losses from wagering transactions to the extent of the gains from such transactions. In order to establish entitlement to a deduction for wagering losses in this Court, the taxpayer must prove that he sustained such losses during the taxable year. See Mack v. Commissioner, 429 F.2d 182 (6th Cir. 1970), affg. T.C. Memo. 1969-26; Stein v. Commissioner, 322 F.2d 78 (5th Cir. 1963), affg. T.C. Memo. 1962-19. He must

also prove that the amount of such wagering losses claimed as a deduction does not exceed the amount of the taxpayer's gains from wagering transactions. See sec. 165(d). Implicitly, this requires the taxpayer to prove both the amount of his losses and the amount of his winnings. See Schooler v. Commissioner, 68 T.C. 867, 869 (1977); Donovan v. Commissioner, T.C. Memo. 1965-247, affd. per curiam 359 F.2d 64 (1st Cir. 1966). Otherwise, there can be no way of knowing whether the sum of the losses claimed on the return is greater or less than the taxpayer's winnings. See Schooler v. Commissioner, supra at 869. For example, if the taxpayer, in addition to the winnings reported on his or her return, received other winnings that were not reported, then the taxpayer must prove that the losses claimed in his or her return exceeded the unreported winnings in order to be entitled to deduct any such losses. See id.; Donovan v. Commissioner, supra. The amount deductible in this situation is the amount of the claimed losses which exceeds the unreported winnings, as long as such excess is less than the winnings reported on the taxpayer's return. See sec. 165(d); Schooler v. Commissioner; supra; Donovan v. Commissioner, supra.

In this case, the "racetrack" winnings reported on petitioner's 1991 return, $21,379, exceed the "gambling"

losses deducted on that return, $19,690. Petitioner testified at trial that at one time he had records consisting of a shoe box full of losing tickets from the racetrack that would have substantiated the loss deduction but that those records were lost when the undercover investigation was terminated. Petitioner testified as follows:

> THE WITNESS: *** Now, as one of the letters indicates from the FBI, that things were left behind. One of the things that was left behind in the safe was a shoebox of losing [racetrack] tickets that would have served [sic] the $19,000.

Even if we were to accept petitioner's explanation for his failure to verify the gambling losses claimed on his 1991 return, we could not agree that he has met his burden of proof regarding the gambling losses. Petitioner did not prove the amount of his gambling winnings, both reported and unreported, and, thus, he failed to prove that the amount of the wagering losses claimed on his 1991 return, $19,690, is greater than his unreported gains from wagering transactions.

Petitioner acknowledged during his testimony at trial that he had additional winnings that were not reported on his return. On cross-examination, petitioner testified as follows:

Q    Now, these winnings are only based upon on [sic]
     the forms you received from the Government?

A    Right.

Q    You received other gambling winnings in that
     year, correct?

A    Yes.  I also had a lot of losses.

Q    But with respect to the gambling winnings, you
     won other money at the racetrack, correct?

A    Oh, yes.

Thus, petitioner admitted that he had earned gambling

winnings at the racetrack in addition to the winnings he

reported on his return for 1991.

There is also evidence that petitioner had winnings

other than from betting at racetracks.  For example, the

FBI agents with whom petitioner cooperated during the

undercover investigation were aware that he had "sizeable

losses and sizeable winnings at racetracks and casinos."

Furthermore, petitioner testified that in 1991 he engaged

in other gambling activities.  He testified as follows:

Q    Did you bet any other activities during 1991?

A    I bet summer baseball and I play casinos,
     the dice, poker, everything.

Q    At the casinos?

A    I'm a gambler.

Q    And you bet--

A    I'll bet anything.

Q    --anything and lose, correct?

A    Anything you could bet.

When asked whether he reported "income" from those

activities, he gave the following vague testimony:

Q    Okay.  But you don't have any of that income
     listed on your 1991 tax return; is that
     correct?

A    Well, there wasn't any at that time.  I was
     with the FBI at all times.  Being with the
     FBI, they were with me.  I didn't list
     anything because we would be at the casinos.
     We would take drug dealers to the casinos.
     And I was always with two agents and I was
     always risking my life every time I went
     out because the FBI was a mile away from me.

Q    Thank you.  But you had other gambling wins
     that you did not report?

A    I don't think so.  I lost that year, because
     I was winning, too.

There is no evidence in the record that gives us a

basis for determining or even guessing the amount of

unreported gambling winnings earned by petitioner during

1991.  Accordingly, we find that petitioner has failed to

prove that the losses from wagering transactions claimed as

a deduction on his 1991 return do not exceed the gains from

such transactions, as required by section 165(d), and we

sustain respondent's disallowance of the wagering losses claimed on petitioner's 1991 return.

Lump-Sum Payment From FBI

The next issue is whether petitioner is entitled to exclude from gross income or deduct any or all of the lump-sum payment received from the FBI in the amount of $100,000. Petitioner acknowledges that he received the lump-sum payment, and he testified candidly: "I know I owe taxes on it." He testified that the lump-sum payment was paid in part as his share of the property seized by the Government during the investigation, in part as consideration for refusing to join the witness protection program, and in part as reimbursement for the expenses of relocating his family. In his posttrial brief, petitioner focuses on the last of the above three reasons for the lump-sum payment, relocation expenses. He argues that he "incurred substantial expenses and cost associated with moving his family" and that "an allowance for relocation expenses" should be taken into account in computing the taxable amount of this lump-sum payment. Petitioner's brief states:

> While acknowledging that the burden of proof
> rests upon the petitioner for this issue, common
> sense would dictate the consideration of <u>some</u>
> costs associated with moving the petitioner and
> his family.

Petitioner claims that the Internal Revenue Service had previously agreed "to allocate twenty percent (20%) of this payment toward relocation expenses."

Respondent argues that petitioner is required to include in gross income the entire lump-sum payment of $100,000 received from the FBI.  Respondent argues that, except for his self-serving testimony:  "Petitioner has not offered any evidence to prove he incurred the expenses claimed or that the alleged expenses were deductible."

We agree with respondent.  There is no basis in the record of this case upon which we can find that some or all of the lump-sum payment should be excluded from petitioner's gross income.  According to the record, the FBI intended the payment to award petitioner a share of the seized property, to compensate petitioner for his cooperation, and to defray any relocation expenses he had incurred.  The original telex requesting authorization to make the payment states that it "represents a share of the value of United States currency, certificates of deposit, vehicles, residences, farms, and business locations seized as a direct result of the cooperation furnished".  Rewards

of this kind are includable in gross income. See sec. 1.61-2(a)(1), Income Tax Regs. Similarly, Mr. Allen's letter of March 27, 1995, states that the payment was to offset relocation expenses and to compensate petitioner. The receipt for the advance on the lump-sum payment allocates the entire amount to "services". Compensation payments are includable in the recipient's gross income. See sec. 1.61-2(a), Income Tax Regs.

Petitioner cites no authority under which the lump-sum payment would be excluded from gross income. We understand that payments to a Government witness are sometimes considered by the Commissioner as welfare payments to the recipient that are not includable in the recipient's income. See G.C.M. 37,028 (Mar. 3, 1977) and G.C.M. 37,564 (June 9, 1978). For example, assistance payments made by the Department of Justice under the witness protective program of the Organized Crime Control Act of 1970, Pub. L. 91-452, tit. V, 84 Stat. 922, 933-934, are treated as welfare payments and are excluded from gross income. See G.C.M. 37,028 (Mar. 3, 1977).

The lump-sum payment made to petitioner in this case was not made under the witness protection program, nor was it made in consideration of petitioner's declining to enter the witness protection program. Petitioner has shown no

basis for excluding all or any part of the lump-sum payment in this case.

Petitioner argues that the lump-sum payment was made to reimburse him for "relocation expenses", and petitioner claims to have incurred relocation expenses "greatly exceeding" the lump-sum payment. However, petitioner presented no proof that he incurred any such relocation expenses. Indeed, in his posttrial brief, petitioner never identifies the payees of such expenses, nor does he give the amounts, dates, and purposes of any such payments. At trial, he suggested, at one point, that his relocation expenses consisted of cash payments made to his sons and his former wife ("I gave each son $5,000, I gave her 10, and $18,000 to move--"). At another point, petitioner made reference to "receipts from the moving company" that were left in the abandoned safe when the undercover investigation terminated. Petitioner never substantiated any such payments, such as by obtaining duplicate "receipts" from the moving company. Thus, even if the lump-sum payment were excludable from gross income to the extent used to defray relocation expenses, petitioner has not substantiated that he paid any such relocation expenses.

To the extent that petitioner claims to be entitled to deduct some part of the payment as relocation expenses,

we also agree with respondent that petitioner has not met his burden of proving entitlement to the deduction. See Rule 142(a), Tax Court Rules of Practice and Procedure. Petitioner does not cite the section of the Internal Revenue Code under which he claims to be entitled to the deduction. See generally secs. 217, 132(a)(6), (g), 82. Moreover, as described above, he refers to relocation expenses, but he never explains the nature of the expenses that he incurred, or identifies the payees, amounts, or dates of any such payments, nor has he introduced proof that he paid any such expenses.

## Accuracy-Related Penalty for 1991

The next issue for decision is whether petitioner is liable for the accuracy-related penalty under section 6662(a), as determined by respondent in the amount of $475. According to the schedules attached to the notice of deficiency, respondent determined that the entire amount of the underpayment was due to negligence. Under section 6662, a penalty is added to a taxpayer's tax liability if any portion of an underpayment is attributable to negligence or disregard of rules or regulations. See sec. 6662(b)(1). For this purpose, the term "negligence" includes any failure to make a reasonable attempt to comply with the provisions of the Internal Revenue Code. Sec.

6662(c).  The amount of the penalty is 20 percent of the portion of the underpayment to which section 6662 applies. See sec. 6662(a).

An exception to imposition of the negligence penalty is provided by section 6664(c).  Under that exception, "No penalty shall be imposed * * * with respect to any portion of an underpayment if it is shown there was a reasonable cause" for that portion of the underpayment and "the taxpayer acted in good faith".  Petitioner bears the burden of proving that he is not liable for the penalty under section 6662(a).  See Vaira v. Commissioner, 444 F.2d 770 (3d Cir. 1971), revg. on another issue 52 T.C. 986 (1969); Bixby v. Commissioner, 58 T.C. 757, 791 (1972).

Petitioner argues as follows:

> Accurate records of gambling losses and winnings are difficult to maintain.  The very nature of the business makes this task daunting, if not impossible.  The very fact that petitioner reported his gambling winnings and losses in his 1991 income tax return, produced records of this fact seven years later, attests to the degree of effort taken by the petitioner to accurately report his gambling winnings and losses.  Before the accuracy-related penalty is imposed, I.R.C. §6662(b)(1) requires taxpayer negligence or disregard for the rules.  In the instant case, the respondent has shown neither exists.

Respondent argues that petitioner has not met his burden of proof under section 6662(a).  According to respondent,

petitioner has not shown that there was a reasonable cause for the underpayment or that he acted in good faith regarding the underpayment.

We agree with respondent. Petitioner's contention, that maintaining accurate records of gambling losses and winnings is difficult, is legally insufficient to overcome respondent's determination. The fact is that all taxpayers are required to substantiate deductions under section 165(d), and petitioner is being held to the same standard that is imposed on all taxpayers seeking a deduction under section 165(d). See, e.g., Wolkomir v. Commissioner, T.C. Memo. 1980-344; Salem v. Commissioner, T.C. Memo. 1978-142; Myers v. Commissioner, T.C. Memo. 1976-191; Taormina v. Commissioner, T.C. Memo. 1976-94.

We find that petitioner did not prove that the under-payment with respect to his 1991 return was due to reason-able cause or that he acted in good faith. Accordingly, we sustain respondent's imposition of an accuracy-related penalty under section 6662(a).

Additions to Tax for 1993

The final issue is whether petitioner is liable for the addition to tax under section 6651(a)(1) for failure to file a timely return for 1993, as determined by respondent in the amount of $6,164. An addition to tax is imposed

under section 6651(a)(1) for failure to file a return unless such failure is due to a reasonable cause and not willful neglect. See sec. 6651(a)(1). The amount of the addition to tax is 5 percent of the tax required to be shown on the return, if the return is filed within a month of the due date, with an additional 5 percent for each additional month or fraction thereof during which the failure continues, not exceeding 25 percent in the aggregate. See id. Petitioner bears the burden of proving that he is not liable for the addition. See Rule 142(a).

Petitioner argues as follows:

> * * * Of the $100,000.00 the petitioner received from the FBI, ninety percent (90%), or $90,000.00 was received after petitioner had worked undercover for the FBI. It was agreed that this payment of $100,000.00 would be used to pay for the enormous cost of relocating the petitioner and his family to Puerto Rico. Although it is true the FBI did not have the authority to determine the taxability of this payment, it is certainly reasonable for petitioner to rely on the FBI's position and statements regarding this payment. Respondent correctly states that is the burden of the petitioner to establish this fact. However, due to the highly sensitive nature of the undercover operation (which is ongoing), it can hardly be expected for the petitioner to produce as witnesses the FBI agents responsible for leading the petitioner to believe this payment would not be considered taxable income. It is the position of the petitioner that this $100,000.00 payment is not fully taxable. If plausible disagreement as to the taxability of this income exists to this day, it can surely be said the petitioner had a reasonable expectation

this payment would not be taxable income; hence reasonable cause and not willful neglect. For these reasons, the respondent's determination should not be sustained.

Thus, petitioner argues that his failure to file his 1993 return is due to "reasonable cause and not willful neglect". Sec. 6651(a)(1). Respondent argues that "petitioner failed to timely file an income tax return for the taxable year 1993 and presented no evidence disputing the assertion of the addition to tax." We find that petitioner's argument lacks merit.

Petitioner admitted at trial that he received the lump-sum payment of $100,000 from the FBI and he owed tax on the payment. He testified as follows:

> THE COURT: * * * Do you admit that $100,000 is income? * * *
>
> THE WITNESS: I admit that was income. * * *
>
> * * * * * * *
>
> THE WITNESS: I know I owe taxes on it. But I figure a reasonable amount should be used for relocation of me.

Thus, petitioner admittedly earned substantial taxable income during 1993, and he was required to file a return for that year. See sec. 6012(a).

Petitioner's posttrial brief implies that he relied on the statements of unnamed FBI agents that the subject lump-

sum payment "would not be considered taxable income". There is no factual basis for such argument in the record of this case. Neither petitioner nor the FBI agent who was called as a witness testified that an FBI agent gave petitioner any such advice. Indeed, petitioner did not even ask the FBI agent about any such statements. Petitioner does not identify the agent or employee of the FBI who allegedly gave him such advice, nor did he subpoena such person to testify. We do not accept petitioner's attempt to explain his failure to call the agent to testify on the ground that the undercover operation was ongoing at the time of trial or that it would have been compromised by the agent's testimony. There is nothing in the record to suggest that the operation was ongoing at the time of trial, but, even if it were, there is no reason to believe that the agent's testimony concerning statements about the taxability of petitioner's lump-sum payment would have compromised the operation. Indeed, petitioner exhibited no such reluctance in 1994 when he filed suit against the FBI and six of its special agents seeking a greater share of the money and property that had been seized during the undercover operation. We find that petitioner failed to show that his failure to file a return for 1993 was due to reasonable cause and not willful neglect, and we sustain

respondent's determination of the addition to tax under section 6651(a)(1) in the amount of $6,164.

To reflect the foregoing and concessions by the parties,

<u>Decision will be entered under Rule 155</u>.