J.S.M. ENTERPRISES, INC., Petitioner v, COMMISSIONER OF INTERNAL REVENUE, Respondent; GILBERT and JEANNE STRAUSS, Petitioners v, COMMISSIONER OF INTERNAL REVENUE, Respondent
J. S. M. Enterprises, Inc. v. Commissioner
Docket Nos. 2134-80, 18997-80.
United States Tax Court
T.C. Memo 1984-269; 1984 Tax Ct. Memo LEXIS 406; 48 T.C.M. (CCH) 138; T.C.M. (RIA) 84269; May 21, 1984. *406 L, president and some shareholder of petitioner J.S.M., purchased 78 paintings and statues from petitioner S. Held, S underreported by $63,500 the amount of gross receipts he received from the sales. Held further, S is not liable for the addition to tax for fraud. Held further, S is liable for the addition to tax for failure to file a required return because neither he nor his wife signed their Form 1040. Held further, S is liable for the addition to tax for negligence. Held further, the paintings and statues were improperly included in J.S.M.'s inventory for 1973 because they were purchased by L for his personal benefit rather than on behalf of J.S.M. Accordingly, J.S.M.'s valuation of the paintings and statutes at zero in its closing inventory for 1973 is disallowed. Held further, J.S.M. is liable for the addition to tax for negligence. Benjamin L. Winderman, for the petitioner in docket No. 2134-80. Howard Gershman, for the petitioners in docket No. 18997-80. Howard P. Newman, for the respondent. NIMS
MEMORANDUM FINDINGS OF FACT AND OPINION NIMS, Judge: In these consolidated cases, respondent determined deficiencies in petitioners' Federal income taxes and additions to tax as follows: Additions to Tax
Docket No
Petitioner
Year
Deficiency
Sec. 6653(a) [1]
Sec. 6653(b)
2134-80
J.S.M.
1973
$61,407.85
$3,070.09
Enterprises,
Inc.
18997-80
Gilbert and
1973
15,906.00
$7,953.00
Jeanne Strauss
*408 Respondent asserts by answer that in the alternative to the addition to tax for fraud under section 6653(b), petitioner Strauss is liable for the additions to tax under sections 6651(a)(1) and 6653(a) for failure to file a required income tax return and negligence or intentional disregard of rules and regulations, respectively.
After concessions, the issues for decision are: (1) whether petitioner Gilbert Strauss ("Strauss") underreported by $63,500 the amount of gross receipts he received from the sales of certain paintings and statues; (2) whether Strauss is liable for the addition to tax for fraud under section 6653(b) or, alternatively, for the additions to tax under sections 6651(a)(1) and 6653(a) for failure to file a required income tax return and negligence, respectively; (3) whether the actual purchaser of the paintings and statues from Strauss was petitioner J.S.M. Enterprises, Inc. ("J.S.M.") or its sole shareholder, Albert Landes; (4) if J.S.M. was in fact the actual purchaser, whether the artwork constituted inventory or a capital asset; (5) if the artwork was properly includable in inventory, whether J.S.M. was entitled to use the lower of cost or market *409 valuation method to value the artwork; and (6) whether J.S.M. is liable for the addition to tax for negligence or intentional disregard of rules and regulations under section 6653(a). FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Petitioners Gilbert and Jeanne Strauss, husband and wife, resided at Philadelphia, Pennsylvania, at the time their petition was filed in this case. Petitioner J.S.M. is a Pennsylvania corporation with its principal place of business at Philadelphia, Pennsylvania. During the taxable year at issue, Albert Landes ("Landes") was the president and sole shareholder of J.S.M. J.S.M.'s principal business activity, as noted on its U.S. Corporation Income Tax Return filed for the taxable year ended March 31, 1974, was the "wholesale sales of stamps and coins." During 1973, J.S.M. placed advertisements in the stamps and coins section of the Philadelphia Inquirer stating its desire to purchase "U.S. Silver & Gold Coins, Rolls, Type Coins, Proof Sets & Stamps, Documents, Etc." Strauss was employed as a fireman in the Philadelphia Fire Department *410 where he earned $11,834 during 1973. Sometime in April of that year, Landes visited Strauss' home to purchase a piece of furniture owned by Strauss. After the sale of the furniture was completed, Strauss and Landes discussed the possibility of the sale of a painting Strauss had hanging in his home. Although Strauss did not sell the painting to Landes at that time, a few days later Strauss took the painting to Landes' store, J.S.M., and consummated the transaction there. The sale of the painting by Strauss to Landes was the first of a series of transactions that ensued during the next five months. Each transaction occurred in a similar manner. Approximately every other day, Strauss would arrive at Landes' store with a painting that he had purchased at a local flea market or antique store. Many of the paintings were signed with the names of famous artists such as Picasso, Chagall, Modigliani, and others. Landes and Strauss would agree upon a price, and then Landes would pay Strauss that amount in cash for the painting. Although Strauss would sign a receipt for each transaction, he never took possession of his copy of the receipt. A total of 76 paintings and two statues were *411 purchased by Landes from Strauss. Receipts signed by Strauss show that $103,500 was the total amount received by him in exchange for the artwork. (After examining some of the paintings, we feel obliged to note that we refer to them as artwork merely for convenience.) On the Form 1040 filed by Strauss for 1973, however, he reported gross receipts of $40,000 from the sales, less $23,100 as his cost in purchasing the paintings and statues. Strauss maintained no written records of the payments made to him by Landes. Landes stored all of the paintings and statutes in the basement of his personal residence. J.S.M. never displayed the artwork nor advertised it for sale.After the final sale was completed, Landes made his first attempt to authenticate one of the paintings. Landes took a painting purportedly signed by Chagall to a New York auction house and learned that the painting was not the authentic work of Chagall. Subsequently, Landes learned that all of the paintings which were bought from Strauss were forgeries. [2]
*412 Landes thereafter proceeded to press criminal charges against Strauss on the grounds of "cheating by false pretenses" and "theft by deception." A criminal complaint was filed by Landes against Strauss on October 5, 1973. A property receipt for the artwork which was taken into custody by the police was signed by Landes.
Strauss was acquitted of the charges in a criminal trial in Philadelphia Common Pleas Court in June, 1975. Prior to the criminal trial, Landes, in his individual capacity, instituted a civil suit against Strauss in which he maintained that he was defrauded by Strauss. During the civil trial, Landes was granted leave to amend the pleadings to include J.S.M. as a co-plaintiff. The Philadelphia Common Pleas Court found for Landes. A panel of judges, however, in an opinion dated January 25, 1977, granted Strauss' motion for a new trial and instructed the presiding judge to consider additional matters. Landes failed to pursue the civil suit further. The purchases of the paintings and statutes from Strauss were not contemporaneously recorded on the books and records of J.S.M. Instead, shortly after J.S.M.'s fiscal year-end, J.S.M.'s accountant, Allen Adlar, made *413 an adjusting entry on J.S.M.'s books which increased both its purchases and sales for the taxable year by $103,400. The purchases entry reflected the alleged purchases of artwork from Strauss [3] while the sales entry was made apparently to account for certain coins sold by J.S.M. Using the lower of cost or market inventory valuation method, J.S.M. valued the paintings and statues at zero in its ending inventory calculation. Consequently, on its Federal income tax return for the fiscal year ended March 31, 1974, J.S.M.'s cost of goods sold expense was increased in the amount of $103,400. OPINION Issue 1. Unreported Income of Strauss
The first issue to be decided in these consolidated cases is whether Strauss underreported the amount of income he received for the paintings and statues he sold to Landes. Strauss contends that he received a total of $40,000, the amount reported by him on the Form 1040 he filed for 1973. Respondent argues that Strauss received $103,500, the amount shown on the receipts of the *414 sales. For the reasons set forth below, we agree with respondent. As noted above, respondent's determination that Strauss received $103,500 for the paintings and statues is based primarily on the receipts signed by Strauss showing that he received that amount from Landes. Strauss maintains that the receipts are inaccurate because they were signed in blank by him and subsequently filled in with fictitious dollar amounts by Landes. Consequently, Strauss argues that we should disregard the amounts shown on the receipts. After carefully reviewing the evidence before us, we reject Strauss' arguments that the receipts are not an accurate accounting of the amount of money that he received from the transactions. Initially, we note that Strauss neither took possession of his copy of any of the receipts nor maintained any separate written records documenting the cash that was paid to him by Landes. Either of these steps would have required a minimal effort on the part of Strauss and would have clearly established a basis for refuting the accuracy of the receipts if a discrepancy had arisen. Next, and most importantly, we reject Strauss' arguments that the receipts are inaccurate *415 because we find little credibility in Strauss as a witness. [4] Strauss testified that his memory was poor and that he has difficulty remembering events that occurred two hours ago. We can confirm Strauss' self-evaluation because he frequently testified inconsistently at trial. Although notations were apparently added to some of the receipts by Landes, they are unrelated to the amount of cash paid to Strauss. We do not accept Strauss' self-serving testimony that blank receipts were signed by him and that Landes subsequently filled in arbitrary dollar amounts totaling $103,500. In addition to the receipts totaling $103,500, respondent supports his determination that Strauss underreported the income he received from the sales through a reconstruction of Strauss' income by the bank deposit method. Respondent's reconstruction revealed substantial *416 unexplained deposits which Strauss testified as being due to a substantial cash hoard which he had accumulated by gifts during prior years. Again, we reject Strauss' explanation of the deposits because of his lack of credibility. Strauss urges us to accept the $40,000 amount reported on the Form 1040 submitted by him as the amount of gross income he received from the sales. Presumably, this amount was determined by Strauss from his personal memory of the 78 separate sales that occurred over a period of five months because he maintained no written records of the transactions. We must reject Strauss' contentions because of his limited credibility as a witness and the lack of independent corroborating evidence. Consequently, we place no significance on the $40,000 amount reported by Strauss and uphold respondent's determination that Strauss underreported the gross receipts from the sales of the paintings and statues by $63,500. Respondent also asserts against Strauss an addition to tax under section 6653(b) for fraud. In the alternative, respondent by answer asserts that Strauss is liable for the additions to tax under sections 6653(a) and 6651(a)(1) for negligence or intentional *417 disregard of rules and regulations and for failure to file, respectively. Respondent bears the burden of proving by clear and convinving evidence that a portion of the underpayment was due to fraud. Section 7454(a); Rule 142(b). In addition, respondent bears the burden of proving negligence and failure to file because they were pleaded by answer. Rule 142(a).The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. by unpublished order 578 F.2d 1383 (8th Cir. 1978). To prove fraud, respondent must show that the taxpayer acted with the specific intent to evade a tax believed to be owing. Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968). Fraud may not be presumed or imputed. Stone v. Commissioner,56 T.C. 213, 224 (1971). In support of his assertion of fraud, respondent relies on Strauss' failure to keep written records of the sales to Landes and on his lack of credibility as a witness. Although the Court *418 has in prior cases considered a taxpayer's failure to maintain books and records to be a relevant indicia of fraud, Parsons v. Commissioner,43 T.C. 378, 395 (1964), we attribute Strauss' failure to maintain books and records and his entire course of conduct to careless negligence rather than fraud, insofar as proper income reporting is concerned. We therefore hold that respondent has not carried his burden of proving that Strauss acted with the specific intent to evade taxes. The addition to tax for fraud is thus denied. We believe, however, that Strauss' conduct supports a finding of negligence and consequently the addition to tax for negligence is sustained. We now consider respondent's second alternative assertion that Strauss is liable for the addition to tax under section 6651(a)(1)[5] for failure to file a required return on or before the prescribed filing date. Respondent's assertion of the addition to tax under section 6651(a)(1) rests solely on the fact that neither Strauss nor his wife signed the Form 1040 which they submitted to the Internal Revenue Service. Respondent argues that the unsigned form does not constitute a valid return and thus *419 the addition to tax under section 6651(a)(1) for failure to file a required return is applicable. *420 It is well settled that a taxpayer's failure to sign a Form 1040 is a sufficient ground for the assessment of the addition to tax under section 6651. Vaira v. Commissioner,52 T.C. 986, 1005 (1969), revd. and remanded on other grounds, 444 F.2d 770 (3d Cir. 1971). Moreover, there is no evidence in the record indicating that Strauss' failure to sign the return was due to reasonable cause and not due to willful neglect.Section 6651(a)(1). Respondent's determination of the addition to tax under section 6651(a)(1) is therefore sustained. Issue 2. Ordinary Loss Deduction Claimed by J.S.M.
The second issue we must decide is whether J.S.M. properly included the artwork sold by Strauss to Landes in its inventory. As the alleged purchaser of the artwork, J.S.M. added $103,400 to its inventory purchases for the taxable year at issue. In its closing year-end inventory calculation, however, J.S.M. (using the lower of cost or market inventory valuation method) valued the paintings and statues at zero based upon Landes' discovery that the artwork was not authentic. *421 J.S.M.'s write-off of the artwork as worthless inventory resulted in an increase in its cost of goods sold in the amount of $103,400 and consequently reduced its taxable income for the year at issue by the same amount. Respondent first contends that Landes purchased the paintings and statues from Strauss on his own behalf and therefore J.S.M. was not the owner of the artwork. Alternatively, respondent argues that if J.S.M. was the actual purchaser, the artwork constitutes a capital asset and not an item of inventory because the artwork was not held by J.S.M. primarily for sale to its customers in the ordinary course of its trade or business. Finally, respondent argues that even if the artwork was properly includable in inventory, J.S.M.'s use of the lower of cost or market method to value the artwork should not be permitted because such method results in an unallowable distortion of income. Petitioner J.S.M. argues that the artwork it purchased from Strauss was properly includable at a zero market value in its closing year-end inventory. We are convinced, however, that the purchases were made by Landes on his own behalf and not in his capacity as president of J.S.M. We therefore *422 need not consider respondent's alternative positions for disallowing J.S.M.'s write-off of the paintings and statutes because, for the reasons discussed below, we hold that J.S.M. was not the actual purchaser of the artwork. In support of its position that it purchased the artwork, J.S.M. contends that its business activity includes the purchase and sale of paintings and statues. We disagree. J.S.M. identified the wholesaling of stamps and coins as its principal business activity on its Federal income tax return filed for the taxable year at issue. In addition, advertisements placed by J.S.M. in the stamps and coins section of the local newspaper refer only to the purchase of stamps and coins. J.S.M.'s failure to mention dealings in artwork in either of the above instances is inconsistent with its position that the scope of its business activity extended beyond the purchase and sale of stamps and coins. Landes' contradictory testimony at trial raises further doubt that J.S.M.'s business activity encompasses the transactions at issue. Landes testified that in addition to the stamps and coin business, J.S.M. was in the collectibles business which included the purchase and sale *423 of paintings. When asked to state his occupation, however, Landes testified that he was a numismatist and coin dealer. Not only did Landes fail to state any expertise in the collectibles business, he later admitted that he (the sole owner and operator of J.S.M.) was not an art expert and that J.S.M. had never sold a painting for over $100. J.S.M. nevertheless argues that prior to the disputed transactions it had purchased various collectibles. Although a small quantity of collectibles had previously been purchased by J.S.M., they were apparently used only to adorn J.S.M.'s place of business. [6] We do not believe that J.S.M. had (or sought) any regular customers for paintings, a fact confirmed by the testimony of J.S.M.'s accountant. We recognize that all the purchases occurred at J.S.M.'s place of business and that receipts were prepared which indicate that J.S.M. was the purchaser of the paintings and statues. Under closer scrutiny, *424 however, neither of these facts significantly supports J.S.M.'s contention that it was the actual purchaser of the artwork. First, we view J.S.M.'s place of business as merely a convenient location for Landes to purchase the artwork from Strauss. Initially, negotiations for the sale of the first painting took place when Landes was at Strauss' home purchasing a piece of furniture. The sale was completed when Strauss later brought the painting to J.S.M.'s store where Landes was working. All of the subsequent sales between Landes and Strauss occurred on J.S.M.'s premises.Since Landes was solely responsible for conducting J.S.M.'s operations, his presence at J.S.M. was presumably required during J.S.M.'s lengthy business hours. [7] J.S.M.'s store therefore provided the most convenient location for Landes to purchase the artwork from Strauss. Second, we attach little importance to the receipts of the transactions which indicate that J.S.M. was the purchaser of the artwork. The record shows that J.S.M.'s standard invoice form, which serves as *425 a purchase receipt when the "bought" box is checked, is preprinted with J.S.M.hs name, address and telephone number. The receipts signed by Strauss, however, were made out on a retail salesman's paid with J.S.M.'s name hand-stamped on each receipt. The purported receipts issued by J.S.M. to Strauss are a clear departure from the form of receipt that J.S.M. regularly used to account for its purchases and sales of stamps and coins. Further evidence that J.S.M. was not the actual purchaser of the artwork is J.S.M.'s failure to ever display any of the artwork or ever advertise the items for sale. All of the paintings and statues were stored at Landes' home. [8] Moreover, after Landes had the artwork appraised and learned that none of the items were authentic, criminal and civil charges charging theft and fraud were instituted by Landes in his individual capacity against Strauss. Although it did occur to Landes later to add J.S.M. as a co-plaintiff in the civil suit against Strauss, we believe that the foregoing facts are consistent with our holding that Landes, in his personal capacity, purchased the artwork from Strauss. *426 Finally, J.S.M.'s failure to use its regular method of accounting in recording the alleged purchases from Strauss buttresses our conviction that J.S.M. was not the actual purchaser of the artwork. Allen Adlar ("Adlar"), a certified public accountant and the signed preparer of J.S.M.'s Federal income tax return, testified that J.S.M. maintained four separate accounting journals. Adlar explained that items which were purchased and sold on credit by J.S.M. were recorded in the purchases and sales journals, respectively, while the cash disbursements and cash receipts journals were used to record cash transactions. For example, Adlar noted, a cash purchase by J.S.M. would normally be recorded in the cash disbursements journal. Although J.S.M. claims to have purchased the artwork from Strauss for cash, J.S.M. never recorded the purported purchases in its cash disbursements journal (nor in any of its other accounting journals). Rather, after J.S.M.'s fiscal year-end of March 31, 1974, Adlar entered a debit in the amount of $103,400 to purchases [9] on his working papers in conjunction with his preparation of J.S.M.'s income tax return. Adlar testified that the adjustment was required *427 in order to "correct" J.S.M.'s purchases for the year. In addition, Adlar admitted that the adjusting entry to purchases was not only a departure from J.S.M.'s usual recordkeeping practice but also that it did not accurately reflect the purported purchase of artwork for cash. We believe that J.S.M.'s admitted departure from its regular method of bookkeeping in accounting for the alleged purchases of artwork was due to Landes' (or Adlar's) realization that far greater tax benefits from the worthlessness of the artwork would result if Landes were to claim that he had purchased the artwork as president of J.S.M. rather than for himself personally. Although Adlar stated that the post March 31, 1974, year-end adjustment to purchases was made in order to correct J.S.M.'s purchases, he did not explain the six-month delay in making the adjustment (Adlar had earlier testified that *428 he had learned of the sales by Strauss in September, 1973). A likely motivating factor behind the accounting "correction" was the fact that any capital loss which might have been available to Landes as the personal owner of the artwork would have been limited to $1,000. [10] If J.S.M., however, claimed ownership of the artwork as an item of inventory its taxable income could be reduced by over $100,000 from a write-off of the artwork. In sum, based on the evidence before us, we hold that Landes purchased the artwork on his own behalf and that J.S.M. was not the actual purchaser of the artwork from Strauss. Finally, respondent determined that J.S.M. is liable for the addition to tax under section 6653(a) for negligence or intentional disregard of rules and regulations. J.S.M. bears the burden with respect to proving that the addition to tax is inapplicable. Luman v. Commissioner,79 T.C. 846, 860 (1982); *429 Bixby v. Commissioner,58 T.C. 757, 791 (1972). J.S.M. argues that its reliance on its accountant's advice in valuing the artwork at zero precludes the application of the negligence addition. J.S.M.'s argument misses the point. The decision to include the artwork in inventory (as opposed to its alleged value) was made by J.S.M. alone and is sufficient evidence of negligence in view of the facts of this case. Accordingly, the addition to tax for negligence is sustained. To reflect the foregoing, Decisions will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as in effect for the year in question. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. An appraisal obtained by Landes from Charles Steinberg, a member of the Appraisers Association of America, states that the total value of the artwork is $9,530. The appraisal is dated November 19, 1978.↩
3. No explanation is provided in the record to account for the minor difference between the accounting entry of $103,400 and the receipt total of $103,500.↩
4. Strauss correctly states on brief that "[t]he major consideration for this * * * Court is not even one of substantive tax law, it is of credibility." Moreover, Strauss concludes that we are "faced with determining, quite frankly on the basis of credibility alone, how much * * * [Landes] paid for the items purchased from Strauss."↩
5. SEC. 6651. FAILURE TO FILE TAX RETURN OR TO PAY TAX. (a) ADDITION TO THE TAX. -- In case of failure -- (1) to file any return required under authority of subchapter A of chapter 61 (other than part III thereof), subchapter A of chapter 51 (relating to distilled spirits, wines, and beer), or of subchapter A of chapter 52 (relating to tobacco, cigars, cigarettes, and cigarette papers and tubes), or of subchapter A of chapter 53 (relating to machine guns and certain other firearms), on the date prescribed therefor (determined with regard to any extension of time for filing), unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the amount required to be shown as tax on such return 5 percent of the amount of such tax if the failure is for not more than 1 month, with an additional 5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate. * * *↩
6. Testimony at trial revealed that the dimensions of J.S.M.'s place of business are quite small, measuring approximately 20 by 15 feet. The quantity of artwork sold by Strauss would be far in excess of J.S.M.'s interior decoration needs.↩
7. J.S.M.'s advertisement in the local newspaper states its business hours as follows: Mon. Wed. Fri. 10 - 9; Tues. Thurs. Sat. 10 - 6.↩
8. J.S.M. contends that the artwork was stored at Landes' home because there was not enough storage space on its premises to store the items. While we recognize that J.S.M. probably had inadequate storage facilities for the artwork, we view this fact as just another indication that J.S.M. was not in the business of purchasing paintings and statues.↩
9. Adlar also made a corresponding credit entry to sales in the same amount to account for cash sales of double-die pennies by J.S.M. Although we are equally suspicious of this offsetting entry, the sale proceeds of the coins were apparently included in J.S.M.'s taxable income and thus are not at issue.↩
10. If Landes had sold the artwork and incurred a capital loss therefrom, section 1211 as in effect at that time would have limited his capital loss deduction to $1,000.↩